461 So.2d 716 (1984)
Gregory Steven ANDERSON
v.
STATE of Mississippi.
No. 55224.
Supreme Court of Mississippi.
December 5, 1984.
John C. Webb, Greenville, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, P.J., and BOWLING and PRATHER, JJ.
WALKER, Presiding Justice, for the Court:
This is an appeal from the Circuit Court of Washington County, Mississippi wherein the appellant, Gregory Steven Anderson, was indicted, tried and convicted of murder. Upon conviction he was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Aggrieved with the lower court's holding, he had perfected an appeal to this Court assigning the following as error:
The verdict of the jury was contrary to the overwhelming weight of the evidence and the appellant should be granted a new trial based on the insufficiency of the evidence submitted to the jury to convict him.
On March 25, 1983, a Friday, Susie Hudson, an elderly black female, was found *717 dead. She was lying semi-nude on her kitchen floor with multiple stab wounds to the chest.
A relative, Lela Mae Willis, who lived across the street from Ms. Hudson phoned the police. The phone in Ms. Hudson's home was found lying under some clothes; dresser drawers in her bedroom had been pulled out and ransacked; and a purse was found torn open on her bed.
An autopsy was performed by Dr. Burrow, a pathologist at the Delta Medical Center. Ms. Hudson's blood was typed as "B". She had suffered multiple incised wounds, 27 in all, several of which incised some of her vital organs including the heart. The wounds and resulting hemorrhage resulted in her death. Although it could not be determined which exact wound caused her death, Dr. Burrow testified any of the three in the heart as well as the one in the pulmonary artery would result in death.
The investigating officers found several shoe prints outside the home as well as under Ms. Hudson's body. Two footprints were found in front of the house and others were found leading down the south side of the home. The soil was soft and muddy from a rain shower the previous Wednesday. A full print in front of the house and a half-print on the side of the house were preserved in plaster. After the body was removed, the print seen under its location was of a similar pattern to those prints found outside the home.
At the time of the incident, the appellant, from Chicago, Illinois, was staying with his grandmother, Lela Willis, her husband and daughter. He had been at his grandmother's approximately two weeks.
Officer Charles Cochran, major in charge of crime investigation with the Greenville Police Department, was called to the scene. He later went to Ms. Willis' and asked the appellant to accompany him to the police department for questioning. At the office the appellant voluntarily stated that on Thursday evening he had been with his girlfriend Pam who lived on Shelby Street. He returned to his grandmother's at approximately 10:30 p.m. and noticed the lights at his aunt's house, Ms. Hudson, were on. When he went to bed at approximately 11:15 p.m., the lights were off.
Two days after the appellant arrived at his grandmother's, his aunt accused him of crawling around on her bedroom floor near her bed and he then informed his grandmother that he would not return to Ms. Hudson's ever again.
When the appellant was taken to the police department, he voluntarily gave the officer his tennis shoe which had a stain on part of the canvas as well as the shoe lace. The stains were later identified as human blood of ABO type "B", the same type as appellant and his aunt. The blood appeared to have dropped straight down on the shoes as opposed to being a spattering pattern or smear.
Again later the same afternoon at approximately 4:30 the officers went to appellant and asked if he would submit to fingerprinting which he voluntarily consented to do. No prints of the appellant were found in Ms. Hudson's home.
On Saturday the police department received a call that someone had shot into the appellant's grandmother's house. The appellant alleged two black males fired at him while he was in the yard stating that "this is for Charlie Mason." According to Lela Willis, Charles Mason who was in his late 20's or early 30's lived with Susie prior to her asking him to move from her home. Two bullet holes were found in Ms. Willis' home, but the officers concluded the shots could not have been made from the location where the appellant said the two men were standing.
Later that Saturday, the officers contacted Ms. Willis to ask her grandson if they could examine the clothes he was wearing on Thursday. The appellant voluntarily relinquished his jogging suit. On the cuff area of one pant leg there was the presence of blood; however, due to the insufficiency of the stain further testing could not be done.
*718 The tennis shoes worn by the appellant were of the same print as the cast made of those prints found outside Ms. Hudson's home.
With the above information from the Mississippi Crime Lab on the blood and the print of the shoe an arrest warrant was issued for appellant. The appellant was arrested and brought to the Greenville Police Department on Monday at 11:30 a.m. Officers Cochran and Wynn were present. The appellant was advised of his rights and proceeded to relay the following story: On Thursday at approximately 7:00 p.m. Charlie Mason asked to borrow his shoes and jogging top. He exchanged his shoes with Mason and did not know what Mason planned to do with them. At trial the testimony was that Mason's shoes were a size 10 1/2, whereas the appellant's were a size 8.
After the officers informed the appellant of the information they had on the casts of the footprints and the blood found on his shoes, the appellant related the following story: He saw "Buddy" go to the side window of his aunt's house and knock. "Buddy" went in and later appellant saw him leave. The appellant went to the back door and went inside and saw his aunt lying on the floor. He called her name, bent over, touched her and pulled her over. Her body rolled over on his feet and he got scared and left and didn't tell anyone about the incident.
As his story was still inconsistent with the physical facts, he relayed the following which was reduced to writing and signed: On Thursday at about 9:45 p.m. he went to Susie Hudson's house. He went around to the back and knocked on her window. She asked him to come in. He sat down on the couch and petted her dog. She was drunk at the time and started hugging and kissing him. The appellant asked her to stop and she told him to get out. As he started to leave she ran up behind him with a knife and the two started to tussle. She fell over on the couch at which time the knife went in her. The appellant ran out of the front of the house and then around the side of the home. He went back into the house to see if she was hurt and found that she was going back toward her bedroom. He asked if she was hurt, and she told him she was going to get her pistol and shoot him. He then grabbed her, and it appeared as if she were going to strike him with the knife which was in her left hand. Again the two began to tussle. The knife handle was in appellant's stomach, and she fell into the blade of the knife. She fell on the floor with the knife in her hand. The appellant ran out of the house without taking anything with him. When he left the home he went out the back door.
As stated earlier the deceased had been stabbed twenty-seven times.
The appellant, 20 years of age, testified in his own behalf. He admitted giving the police false statements including that which was reduced to writing.
He told the jury he had been visiting his grandmother for approximately two weeks. During that time he had occasion to be at his aunt's, once to replace her kitchen floor, once to go to the store and again on Wednesday, a rainy day, to borrow a shovel from a shed located behind her home.
The reason that he lied to the police officers was due to threats made to him by two of Charlie Mason's friends as to "what they would do to his grandmother." He also stated he was confused because both officers were talking to him at the same time.
On Thursday evening at approximately 9:00 p.m. he went out to find his girlfriend Pam to go walking. He stated that he had told the police she lived on Shelby Drive; however, he later discovered she lived on Nelson Street. He did not know her last name, and neither he nor the police were able to locate her during the investigation. Unable to find her on that Thursday he returned to his grandmother's. On his way to the house at approximately 9:15 p.m. he saw a person called "Buddy" knocking on a side bedroom window of his aunt's house. Under cross-examination he denied seeing "Buddy" knock on the window but stated *719 that he saw "Buddy" when he later saw two people come out of his aunt's house.
While he was at his grandmother's house, Ms. Hudson called at approximately 9:30 p.m. She did not state anything was wrong or that her house was being broken into. The appellant then, after the phone call, went out to look for Pam whom he found and they walked for approximately 5 to 10 minutes before he walked her home. On his way back to his grandmother's at approximately 10:15 he saw two people come out of his aunt's back door and climb over the gate. He went to his aunt's and saw her lying on the kitchen floor on her right side. He touched her and she fell back and rolled over on his feet. As he was on his way to tell his grandmother, two men grabbed him and took him behind a neighborhood store where they cut up his back with a razor blade telling him that he had seen too much. (The appellant did not exhibit the wounds or otherwise confirm the fact that he had been cut on his back). They said, "You better not say nothing about this, or what I'm going to do to you grandmother." They were not specific in exactly how they would harm his grandmother.
The appellant testified he informed Officers Cochran and Wynn about the two males and their threats after he gave his confession. Both officers denied the appellant's mentioning two friends of Mason who had threatened his grandmother.
The appellant admitted calling the police department as to the shots being fired in his yard. At trial he stated that these two black males gave him a gun, and as they stood in a neighbor's yard he shot into the house. The men told him to phone the police. They threatened to hurt him if he did not do as they said.
He relayed three possibilities as to how blood stains may have gotten on his shoes: He was with his niece, Keater Commons, when she cut her finger on an easy-bake oven game; he had fallen off of a bicycle and cut his left leg; and he had also cut his finger one day when his grandmother was cooking hamburgers.
Following trial the jury returned its verdict of guilty as charged.
On appeal the appellant contends this case tried as a circumstantial evidence case falls within the application of what has become known as the Weathersby rule. See Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).
The appellant's contention lacks merit. The facts as set forth above clearly take this case out from under the application of the Weathersby rule.
The evidence in this case although largely circumstantial was sufficient to support the jury verdict. There was proof that blood of Ms. Hudson's type existed on appellant's shoes; the pattern of which could not have gotten there as he testified. The footprints which were found in the house as well as outside the house were those matching the appellant's shoes. There were also several conflicting statements made to the police, including a signed confession by the appellant. At the trial and in front of the jury the appellant offered his version as to how the blood could have possibly gotten on his shoes, how the footprints were made inside and outside the house and why he confessed to a crime that he did not commit as well as why he gave prior inconsistent stories to the police.
After hearing the testimony, it then became the duty of the jurors to weigh the evidence before them and judge the credibility of the witnesses whom they had an opportunity to observe as they testified. In Williams v. State, 427 So.2d 100 (Miss. 1983), we stated:
We have stated many times that the jurors may accept the testimony of some witnesses and refuse that of others and that they may accept in part and reject in part the evidence on behalf of the State and on behalf of the accused. McLelland v. State, 204 So.2d 158, 164 (Miss. 1967). It is not for this Court to pass upon the credibility of witnesses and where the evidence justifies the verdict it must be accepted as having been found *720 worthy of belief. See also Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980).
427 So.2d at 104.
We find that the evidence as presented was sufficient to support the jury verdict.
Finding no errors in the trial below, the conviction and sentence of appellant are hereby affirmed.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and BOWLING, HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.