580 So.2d 1279 (1991)
Allen LEWIS, Jr.
v.
STATE of Mississippi.
No. 90-KA-0202.
Supreme Court of Mississippi.
May 15, 1991.
*1280 Richard B. Lewis, Chapman Lewis & Swan, Clarksdale, for appellant.
Mike C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and BANKS and McRAE, JJ.
BANKS, Justice, for the Court:
On January 13, 1989, the Circuit Court of Coahoma County tried the Appellant, Allen Lewis, Jr., for the aggravated assault of Linda Faye Collins Carter. The trial ended in a mistrial and a second trial began on February 2, 1989. On February 3, 1989, the jury convicted Lewis and sentenced him as an habitual offender to twenty years imprisonment in the Mississippi Department of Corrections without parole. We affirm.

FACTS
Around midnight or shortly thereafter on August 1, 1988, Ms. Linda Faye Collins Carter (hereafter "Ms. Carter") received several lacerations to her head, face and hand and suffered a gun shot wound to her left chest in an altercation with Allen Lewis, Jr. at a cafe called Lee's Place off the main street in Jonestown, Mississippi.
Ms. Carter and Lewis had previously lived together and had had a son who was about five (5) years old at the time of trial. They had never married and at the time of the trial had just recently broken up.
Ms. Annie Mae Rhodes was at Lee's Place when the incident occurred and testified that she and Ms. Ethel Lee Strong, the proprietor of Lee's Place, were playing cards when she heard a noise behind her. Ms. Rhodes turned around to see Lewis chasing Ms. Carter around a table, Ms. Carter seemingly trying to keep the table between them. Apparently, Ms. Carter was sitting at a table in the cafe when Lewis came in and asked her for some keys (keys to her car) which she said she did not have. Because the two were laughing, witnesses did not think they were fighting until Lewis picked up a chair "like he was going to hit her [Ms. Carter] with it." Ms. Carter testified that Lewis picked up the chair after she threw the car keys by the heater. Lewis never hit Ms. Carter with the chair because he was stopped from hitting her by another customer Larry Veasley, according to the witnesses.
Then, Ms. Carter ran out of the cafe followed closely by Lewis. After two or three minutes Ms. Carter returned, again followed by Lewis. Ms. Rhodes stated that, when they entered the cafe, she saw *1281 that Lewis had a pistol in his hand, and she heard him ask Ms. Carter for a key. According to Ms. Rhodes, Ms. Carter responded by saying "Give me time." Although Ms. Rhodes returned to her game, her attention was diverted a final time when, after hearing what sounded like a firecracker, she turned to find that Lewis had Ms. Carter on the floor. Other witnesses testified Ms. Carter fell to the floor after Lewis hit her on the head with his pistol. While the two were on the floor, a shot was fired but no one knew that Ms. Carter had been shot. Conversely, Mr. Veasley testified that the gunshot was fired while the two were standing and tussling over the gun. According to the witnesses' testimony, Ms. Carter, crawling on the floor, tried to get away from Lewis who sat atop Ms. Carter continuing to hit her with the gun.
Ms. Strong told Lewis to stop, and according to Ms. Rhodes he gave Ms. Strong the gun which she tossed over the bar. Ms. Rhodes and Ms. Strong then helped Ms. Carter to Ms. Strong's car and drove her to Dorothy Humburger's home. An ambulance, called to Ms. Humburger's home, transported Ms. Carter to Clarksdale to the emergency room at the Northwest Mississippi Regional Medical Center.
At the trial, Ms. Carter testified but seemed to have trouble remembering what transpired on August 1, 1988. She did testify to being injured by Lewis and to the fact that Lewis pulled the gun with which she was shot out of his pants. According to Ms. Carter, a fight over her car keys instigated the entire dispute. Ms. Carter and her mother had purchased a car from a neighbor for one hundred, twenty-five dollars ($125.00). Lewis claimed the car belonged to the three of them basing his claim on the fact that he supposedly purchased and installed a motor for the car. When he left Ms. Carter he took the car, and on August 1, 1988, Ms. Carter saw him and demanded the car back. At some point on August 1, Ms. Carter gained possession of the keys to the car. How she got the keys is in dispute. Lewis claimed that she took the keys from the ignition of the car while he was talking to a friend. Ms. Carter argued that Lewis gave her the keys.
Ms. Willie Mae Mix testified for the defense and stated that it was Ms. Carter who had the gun in the cafe, and when she pointed it at Lewis he grabbed it from her. Sometime during the scuffle it went off.
Lewis testified that when he came into the cafe the first time in search of Ms. Carter and the car keys, Ms. Carter jumped up from the table and pulled a knife on him. At that point he picked up the chair feigning intent to hit her with it. Larry Veasley suggested that he and Lewis go outside for awhile, so Lewis claims he then put the chair down. He and Veasley began to walk away when Lewis looked back and saw Ms. Carter coming at him with a gun. He turned, grabbed the gun, and they began tussling over it when it fired one time. Lewis then stated that he hit Ms. Carter over the head with the pistol to "trick her to let go of the knife." According to Lewis, Ms. Strong took the pistol from him and someone else took the knife from Ms. Carter after she had fallen to the ground. Lewis contended that he only hit Ms. Carter one time and that was to get the knife away from her.
On cross-examination the State asked Lewis whether he had possessed a gun on August 1, or ever possessed a gun or threatened Ms. Carter. Lewis denied all the State's questions. The State then made an offer of testimony to rebut Lewis's testimony that he never had a gun.

ISSUES
Lewis appeals to this Court assigning four errors:

I.

THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION FOR A NEW TRIAL BASED UPON THE FAILURE OF A JUROR TO FULLY AND PROPERLY RESPOND TO QUESTIONS DURING VOIR DIRE CONCERNING HER RELATIONSHIP BY BLOOD OR MARRIAGE TO THE VICTIM.
*1282 During voir dire the first question that the court asked the potential jurors was "Are any of you related by blood or marriage to Mr. Allen Lewis, Jr. or Ms. Linda Faye Collins?" There was no response. Lewis complains that one juror, Ms. Ethel H. Thomas, was related by blood or marriage to Ms. Carter, and her failure to disclose this relationship prejudiced Lewis. Therefore, the trial court committed reversible error in refusing to grant a new trial based on Ms. Thomas's failure to disclose her relationship to Ms. Carter. This assignment of error is without merit.
What the evidence shows is that at one time, Ms. Carter and Mr. W.L. Wilkins lived together but outside of wedlock, and although they had two children together, they were never married. At the hearing on Lewis's Motion for a New Trial it was revealed that Ms. Thomas was Mr. Wilkins's aunt. Ms. Thomas was not related by blood to Ms. Carter and because Mr. Wilkins and Ms. Carter were never married, Ms. Thomas could not be related to Ms. Carter by marriage.
Ms. Thomas testified that she did not know Ms. Carter personally and did not know that two of Ms. Carter's children were sired by Mr. Wilkins. Additionally, she had no relationship with and had never had any dealings with Ms. Carter or Ms. Carter's children. Ms. Thomas also added that she did not answer affirmatively to the question concerning her relationship to Ms. Carter because she did not consider herself related to Ms. Carter.
Ms. Thomas did answer affirmatively when asked by the court whether anyone knew Ms. Carter. The following transpired:
BY THE COURT: All right, fine. All right, Ms. Thomas, you know the victim in the case, Ms. Collins Carter. Is that right?
BY MS. THOMAS: Yes. Not personally.
BY THE COURT: You don't know her personally?
BY MS. THOMAS: No.
BY THE COURT: Do you feel that it would cause you any problems to sit as a juror because of knowing her?
BY MS. THOMAS: No, sir.
BY THE COURT: You could totally lay that aside and be fair and impartial both to the State and to her?
BY MS. THOMAS: Yes.
Later in the court's questioning, Ms. Thomas answered affirmatively to having read about the case in the newspaper, but answered that she had not formed any opinion about the case. Again, she said she could be a fair and impartial juror.
The trial court denied Lewis's motion for a new trial, ruling that Ms. Thomas was not related by marriage to Ms. Carter because there had been no marriage between Ms. Carter and Mr. Wilkins. The court also ruled that Ms. Thomas and Ms. Carter were not related by blood. Therefore, Ms. Thomas's failure to respond to the court's question was proper.
Lewis relies on Odom v. State, 355 So.2d 1381 (Miss. 1978), where this Court reversed the defendant's conviction of burglary and remanded the case for a new trial when a juror failed to respond to a question during voir dire, holding that there was a strong inference that the defendant was prejudiced by the juror's selection. Id. at 1383. The juror, however, failed to disclose the fact that his brother was a police officer in the area where the arson was committed, when asked during voir dire whether anyone had a close relative who was involved in law enforcement. Id. at 1381-82.
Odom is readily distinguished. Unlike the juror there, Thomas gave an accurate response to the question posed. She was not related by blood or marriage to the victim. That her nephew at some previous time had some relationship with the victim does not change this fact. She answered accurately that she knew the victim but not personally. One might contend that she omitted data that counsel may have found of interest. The fact is, however, that she was not asked how she knew of the victim or what she knew of her. There is no evidence that Thomas enjoyed such a relationship with Carter that any reasonable person would have felt compelled to disclose *1283 in response to the questions actually posed:
The failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause. Therefore, we hold that where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered.
Odom v. State, 355 So.2d at 1383.
The Court added that this determination is "a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong." Id. (citing Jones v. State, 133 Miss. 684, 713, 98 So. 150, 152 (1923)).
Here the court posed a relevant and direct question. The extent to which the question applies to the relationship at issue is, at best, ambiguous. Moreover, according to Ms. Thomas, she did not know that she was in any way related to Ms. Carter and did not respond to the court's question for that reason. If this fact is accepted then the third prong of the test must be answered negatively. According to Odom, the trial court was not required to probe any further.
In Logan v. State, 465 So.2d 339, 339-40 (Miss. 1985), a jury convicted a defendant of rape and sentenced him to twenty (20) years imprisonment, but the defendant appealed on the basis that one juror failed to respond affirmatively to the court's question, "Have any of you or any of your close relatives been the victim of such a crime or a similar crime." On appeal the defendant contended that had he known that the juror's niece had been a victim of rape he would have examined the juror closer and challenged for cause, if not peremptorily. Id. The Court applied the Odom guidelines and upheld the conviction. Id. We found that although the answers to two of the three questions were affirmative, the question was ambiguous, thus failing the test. Id. at 340. Additionally, the Court concluded that no prejudice resulted because the juror stated that his knowledge of his niece's rape had no effect on his verdict. Id. See also Dorrough v. State, 437 So.2d 35 (Miss. 1983) (the Court affirmed a conviction of defendant for aggravated assault on a police officer where the question asked met two of the Odom guidelines but failed the Odom test because it was ambiguous).
Finally, in Odom we were concerned with giving the attorneys ample opportunity to ask follow-up questions to elicit facts they need to exercise appropriate challenges. This case differs from Odom, in that Ms. Thomas answered two subsequent questions relating to her knowledge of Ms. Carter and the case, thus giving the attorneys two additional opportunities to ask follow-up questions. These were two opportunities the defense in Odom did not have. This assignment is without merit.

II.

APPELLANT WAS DEPRIVED OF A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF DUE PROCESS WHEN THE LOWER COURT REFUSED TO GRANT A MISTRIAL ON THE GROUNDS THAT THE COURT REFUSED TO TRANSCRIBE THE PRIOR TESTIMONY OF THE VICTIM AT A PREVIOUS TRIAL OF THIS MATTER; *1284 ALLOWED THE VICTIM'S MOTHER TO TESTIFY OVER APPELLANT'S OBJECTION AFTER SHE HAD LISTENED TO THE TESTIMONY OF ALL WITNESSES AT THE PRIOR TRIAL; DID NOT GRANT A NEW TRIAL AFTER IT WAS SHOWN DURING APPELLANT'S MOTION FOR A NEW TRIAL THAT THE VICTIM'S HUSBAND, JAMES CARTER, TALKED WITH SEVERAL WITNESSES CONCERNING THE PREVIOUS TESTIMONY OF HIS WIFE DURING COURT RECESSES DURING THE TRIAL OF APPELLANT.

A. Court's Refusal to Transcribe the Prior Testimony of the Victim at a Previous Trial.
On January 13, 1989, Lewis was tried for the present charge of aggravated assault; however, the jury was unable to reach a verdict and the trial ended in a mistrial. Because Lewis had been incarcerated since the incident occurred in August 1988, he desired to have the second trial as soon as possible. The second trial was scheduled for February 2, 1989, two weeks after the first trial ended. Neither Lewis nor the State requested a transcription of the testimony at the first trial before the second trial began.
In the second trial, after the jury had been selected and empaneled, and after the State had produced its first two witnesses, Lewis informed the Court that he would request a mistrial if major discrepancies in the testimony of the witnesses occurred since the Court reporter did not have sufficient time to transcribe the prior testimony. Now Lewis contends that he was denied the opportunity of an adequate defense without the transcript of the witnesses' testimony at the first trial.
During the second trial, outside the presence of the jury, the following occurred:
BY MR. LEWIS: Yes, sir. I wanted to put this in the record. I don't know exactly how to approach this at this time and you never know, but, as this Court knows, this case was tried and resulted in a hung jury on Friday the 13th, earlier in this term. Due to time, a lot of other problems, I couldn't possibly expect the court reporter to, even though I've got a right to get her to, transcribe the testimony that occurred at this prior trial, and I'm just saying, your Honor, that I anticipated this and I spent about four hours yesterday while we were waiting on that other jury, listening to these tapes because I anticipated these witnesses who testified at the prior trial to start changing their testimony. Of if they did I would be prepared.
I am not saying at this time that I want to stop everything and delay this thing and have everything transcribed. I am actually trying to get some guidance from the court. There may not be anything else that comes up; I don't know. They may stick to their guns. But I think it is my duty, in representing this man here, that I've got to, and I'm not trying to delay any trial, I'm just trying to do what I think I'm supposed to do. But I don't want to get into having to play tapes and I don't want to get into having everything transcribed and make this thing drag out for weeks because that would make everything drag out.
But I do want to be able to protect my client and be able to impeach these people when they start wavering from something they've testified to under oath. I am not saying at this point I really know what to do except I wanted to bring that to the Court's attention.
Lewis agreed with the trial court that up to this point any discrepancies in testimony had been dealt with sufficiently. The court noted that there would be a substantial delay in the trial if it were stopped at this point to await a transcription of the first trial. Because no problems had yet arisen, the court stated that it would wait to see if any substantive differences occurred that would warrant a transcription. Additionally, the court mentioned the possibility of continuing the trial to the next court term to enable a transcript to be completed, but Lewis stated that he was not asking for a continuance.
*1285 At the close of the State's case-in-chief, Lewis moved for a mistrial on the ground that Ms. Carter's inability to remember some details of the evening when the incident occurred constituted material discrepancies in her testimony. Without the benefit of a transcript of her prior testimony, Lewis was unable to take advantage of the inconsistencies.
Lewis cites Ruffin v. State, 481 So.2d 312 (Miss. 1985), for the proposition that in some instances a transcript of a prior mistrial would be valuable to an appellant either as a discovery device in preparation for trial or as a tool at trial for the impeachment of prosecution witnesses. Id. at 315. In Ruffin, however, we affirmed the appellant's conviction and noted that any discrepancies in testimony were explained, thus no prejudice occurred by the denial of the mistrial transcript. Id. The Court also noted that the appellant in Ruffin, as Lewis below, made no request in advance of trial for a continuance so that the reporter might have time to prepare a transcript as requested. Id.
Lewis, also cites Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), where the United States Supreme Court affirmed a conviction holding that in the narrow circumstances of that case, a transcript was not needed for the petitioner's defense. The Court noted that both trials occurred within one month of each other, and that both trials took place in a small town before the same judge, with the same counsel, and court reporter, who would have read back the transcript to defense counsel before the second trial, had she been asked to do so. Id. at 227, 92 S.Ct. at 433. The Court based its decision on the fact that the petitioner had an informal alternative, the court reporter herself, which appeared to be substantially equivalent to a transcript. Id. at 227-28, 92 S.Ct. at 433-34.
Britt held that when an indigent defendant claims a right to a free transcript, there are two factors relevant to determining his need: (1) value of the transcript to defendant in connection with appeal or trial for which it is sought; and (2) the availability of alternative devices that would fulfill the same function as a transcript. Id. at 227, 92 S.Ct. at 433. There is no indication that Lewis claimed to be indigent or requested a "free" transcript. The parties do not dispute the value of the transcript. What is important is the fact that a transcript did not exist and neither party requested that a transcript be prepared. So, the issue here is not the cost of making the transcript available to an indigent defendant. Both the State and the defense had equal access to a transcription  none was available, thus neither could take advantage of a transcript. Secondly, there was a taped recording of the previous trial that was made equally available to both parties. Additionally, the judge stated that the court reporter could be summoned to testify.
In the case below, Lewis's trials occurred under similar circumstances as those in Britt. Both trials were held in the Circuit Court of Coahoma County and held within two weeks of each other. There is no indication that the court reporters were the same but the judges were different. However, like Britt, Lewis had an alternative to the transcript, the actual tape recording of the former trial. The court told Lewis that the tapes were available for his use, he could take notes on the tapes and use the notes, or he could call the court reporter to verify what was previously said.
In a more recent case, this Court reversed the defendant's conviction for the sale of marijuana based on the fact that the trial court committed reversible error when it overruled defendant's request for a transcript of his initial mistrial. Fielder v. State, 569 So.2d 1170 (Miss. 1990). The facts in Fielder differ substantially and materially from those here. First, there were only two witnesses to the transaction in Fielder, and their testimony differed in important areas. Secondly, a period of over ten (10) months transpired between the first and the second trial. Thirdly, a different public defender represented the defendant in the second trial. Finally, the defendant asked for a transcription of the first trial prior to the start of the second trial. This Court found that no alternative *1286 existed to assure that the defendant was afforded a fair trial. Consequently, the court reversed the conviction.
This portion of Lewis's second assignment of error is denied.

B. Court's Failure to Sustain Appellant's Objection to Victim's Mother's Testimony After She Heard Testimony of All Witnesses at First Trial.

Lewis contends that allowing Ms. Carter's mother to testify as a rebuttal witness in the second trial was a violation of Rule 615 of the Mississippi Rules of Evidence. This assignment of error is based on the fact that Ms. Collins, Ms. Carter's mother, was present in the court room during the entire first trial.
Rule 615 provides:
At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.
Miss.R.Evid. 615.
According to the record all witnesses other than the defendant, Allen Lewis, were called, sworn and excluded from the courtroom. Thus, the rule was invoked and consequently, Ms. Collins was not in the courtroom during the second trial. Lewis complains that error occurred when she was allowed to testify in the second trial after hearing the witnesses' testimony in the first trial. The State offered Ms. Collins's testimony as a rebuttal testimony in the second trial to that of Lewis.
Lewis cites no authority for his position. Appellant bears the burden of providing authority to support his assignments of error. Allman v. State, 571 So.2d 244, 254 (Miss. 1990); Kelly v. State, 463 So.2d 1070, 1072 (Miss. 1985). His inability to find support is not surprising. It is not the office of our sequestration rule to completely insulate potential witnesses from each other. That is simply not possible. Rule 615 can only prevent the possible contamination of testimony from the immediate exposure to the live testimony of other witnesses during the procedure in question. There is no rule preventing witness from being exposed to testimony in former proceedings, whether live or by transcript. The fact of such exposure in whatever form may be disclosed to the jury for its consideration but it does not bar the witness. This portion of Lewis's second assignment of error is also without merit.

C. Court's Refusal to Grant Mistrial After Victim's Husband Talked With Several Witnesses Concerning the Previous Testimony of His Wife During Court Recesses.

Lewis contends that an additional violation of Rule 615 of the Mississippi Rules of Evidence occurred when James Carter, Ms. Carter's husband, talked to witnesses on at least one occasion during court recesses. According to the testimony of Margie Gilbert, Lewis's cousin, during Lewis's hearing on his motion for a new trial, she overheard Mr. Carter tell witnesses, "Faye said y'all were sitting down. Don't forget y'all were sitting down." Ms. Gilbert also testified that she saw Mr. Carter in the witness room on approximately three (3) occasions. Mr. Carter was called to testify and denied saying anything to any of the witnesses.
The trial court denied Lewis's motion for a new trial on the basis of this alleged violation stating that Mr. Carter was not a witness and was not under the rule. The court observed that the witnesses were instructed not to talk to anyone about their testimony, but if they had talked to Mr. Carter about sitting at a table or not sitting at a table, such a fact, considering the nature of the case, did not have any major influence on the jury.
Again, other than citing Rule 615, the appellant fails to provide any support for this assignment of error. Mr. Carter's *1287 speaking to the jurors about his wife's testimony, however, violates the spirit of Rule 615. It should be made clear that not only are the parties and their attorneys prohibited from disclosing the testimony of other witnesses, but the court has ample authority to deal with strangers to the litigation who would interfere with the orderly administration of justice by knowingly violating the rule. See, Rule 5.01, Unif.Crim.R. Cir.Ct.
Here, the trial court finding that such wrongdoing as occurred was harmless is not clearly erroneous and will be credited. Without a showing of how Lewis was prejudiced, this assignment of error is without merit.

III.

THE COURT ERRED IN ALLOWING THE STATE TO CALL THE VICTIM'S AUNT AS A REBUTTAL WITNESS TO PROVE SPECIFIC INSTANCES OF APPELLANT'S CONDUCT BY EXTRINSIC EVIDENCE FOR THE PURPOSE OF ATTACKING THE APPELLANT'S CREDIBILITY.
Lewis testified that Ms. Carter was armed with both a knife and a gun, and after she came at him, he attacked, but his attack on Ms. Carter was strictly defensive. He denied having had possession of a gun on the night of the incident or several days prior to the incident.
On rebuttal the State called Ms. Martnee White, Ms. Carter's aunt, who testified that Lewis had visited her house three days before the assault looking for Ms. Carter. She stated that Lewis had made a "pistol play," showing her the gun he had in his pocket.
On appeal, Lewis claims that the State offered the testimony as substantive evidence of other crimes rather than as impeachment of Lewis's credibility, although it was admitted under the guise of impeachment. Lewis contends that because the evidence concerned other crimes, the state should have elicited the testimony in its own case in chief. Thus, it was error. The appellant offers no support for this proposition.
Lewis further contends that to admit Ms. White's testimony as impeachment evidence was error under Rule 608 of the Mississippi Rules of Evidence. Rule 608 provides:
(b) Specific Instances of Conduct. Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
Miss.R.Evid. 608(b).
Lewis concedes that the rule provides that if the evidence is probative of truthfulness, specific acts may be inquired about on cross-examination. He contends that no party may go any further. In Pinson v. State, 518 So.2d 1220 (Miss. 1988), the defense offered testimony in a rape trial to impeach the victim's husband. Id. at 1223. The husband had testified that because of the rape, he was living apart from his wife and was not living with any other woman. Id. The defense offered testimony that the husband was living with another woman. Id.
The Court held that specific instances of conduct may not be proven by extrinsic evidence for impeachment purposes; they may only be inquired into on cross-examination. Id. When the husband in Pinson denied seeing any woman other than his wife, the defense could go no further. Pinson v. State, 518 So.2d at 1223. Additionally, the Court decided that the husband's post-rape infidelity was a collateral issue and irrelevant. Id.
Here the testimony was not introduced as a specific instance of conduct to impeach Lewis's credibility, and thus, Miss.R.Evid. *1288 608(b) is not applicable. Nor was impeachment, in this instance, on a collateral issue. Who had a gun and who was the aggressor was central factual issue.
In Pinkney v. State, 538 So.2d 329 (Miss. 1988), we upheld the introduction of similar evidence. Pinkney was an appeal from a capital murder conviction wherein it was alleged that a deputy extracted a confession from the defendant by holding a gun to his head. The testimony complained of was that of another officer that he had never seen the deputy carry a gun. We held that this testimony was not reputation or character evidence to show that the deputy was peaceful, but a statement of fact.[1]
Lewis claimed that his attack came after Ms. Carter approached him with both a knife and a gun. No one but Lewis testified to seeing a knife, and Lewis claimed that he never had possession of a gun. He denied having a gun when he came looking for the victim three days later. Ms. White's testimony was offered to show that Lewis had a gun three days before. Based on the reasoning in Pinkney, Ms. White's testimony was not reputation or character evidence but a statement of fact relevant to the merits. Consequently, the testimony was admissible, and this assignment of error is without merit.

IV.

THE VERDICT OF THE JURY WAS CONTRARY TO THE SUBSTANTIAL WEIGHT OF THE EVIDENCE AND A NEW TRIAL IS WARRANTED IN THE INTEREST OF JUSTICE.
The evidence presented is conflicting in this case, and it is not this Court's function to determine whose testimony to believe. Thomas v. State, 495 So.2d 481 (Miss. 1986); Anderson v. State, 461 So.2d 716 (Miss. 1984). Where there is substantial evidence to support a verdict, this Court will not disturb a jury's finding. Inman v. State, 515 So.2d 1150 (Miss. 1987); Fisher v. State, 481 So.2d 203 (Miss. 1985). Here the jury verdict is not contrary to the overwhelming weight of evidence. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons the judgment of the circuit court is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
NOTES
[1] More accurately, it is evidence of habit admissible under Rule 406 M.R.E.