846 So.2d 260 (2002)
Maurice GRAY, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01180-COA.
Court of Appeals of Mississippi.
November 5, 2002.
Rehearing Denied January 7, 2003.
Certiorari Denied May 15, 2003.
*261 George T. Kelly, Greenville, Edward J. Bogen, Jr., Leland, attorneys for appellant.
Office of the Attorney General by Charles W. Maris Jr., attorney for appellee.
EN BANC.
LEE, J., for the court.

PROCEDURAL HISTORY
ś 1. In June 1999, a Bolivar County jury convicted Maurice Gray of murder and aggravated assault. Gray was sentenced to serve a term of life imprisonment for the murder conviction and twenty years imprisonment for the aggravated assault charge, said sentences to run concurrently. Thereafter, Gray filed a motion for new trial or in the alternative a judgment notwithstanding the verdict, which was denied. Aggrieved, he appeals to this Court and raises the following issues for our review: (1) did the trial court err in allowing evidence to be presented concerning Gray's former drug arrest; (2) did the trial court err in failing to give a limiting instruction regarding evidence of Gray's former drug arrest; (3) did the trial court commit error in refusing Gray's requested manslaughter instruction; (4) was the trial court's failure to remove a juror error; and (5) did the cumulative impact of all errors require reversal of the conviction? We review all issues presented and find no merit; thus, we affirm.

FACTS
ś 2. In August 1998, Maurice Gray was arrested for drug possession. Thereafter, Gray was heard to make threats against Ladell Lay and other persons he thought had alerted the police as to his possession of the drugs. On or about September 10, 1998, Gray approached a car which was occupied by Lay and Alonzo Cooper. After words were exchanged, Gray pulled out a gun and shot both Lay and Cooper, *262 striking Lay in the head which killed him and striking Cooper in the buttocks as he tried to flee. Gray left the scene, but was later apprehended and was ultimately charged with murder and with aggravated assault.
DISCUSSION OF THE ISSUES
I. DID THE TRIAL COURT ERR IN ALLOWING EVIDENCE TO BE PRESENTED CONCERNING GRAY'S FORMER DRUG ARREST?
ś 3. With his first issue, Gray argues the trial court erred in allowing the State to present evidence concerning Gray's August 1998 arrest for drug possession. The standard of review concerning the admissibility of evidence is abuse of discretion, and absent such abuse, we will not reverse the court's ruling. Hall v. State, 611 So.2d 915, 918 (Miss.1992).
ś 4. As previously mentioned, one month prior to the shooting at issue, Gray had been arrested for possession of drugs with intent to distribute. Gray believed that someone had alerted the police that he had drugs in his car, and he was later heard to threaten those he believed had "snitched on him." Based on this evidence, the State sought to introduce this evidence to show Gray's motive for the shooting. Gray objected, saying the evidence was highly prejudicial and would prevent him from receiving a fair trial. The judge ruled that since the State's case rested on this motive of Gray's vengeance, the evidence was highly probative as to outweigh any prejudicial effect that might result, according to the balancing test proscribed in Rule 403 of the Mississippi Rules of Evidence ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").
ś 5. Gray refers to the case of Campbell v. State, 750 So.2d 1280 (Miss.Ct.App. 1999), in support of his theory. In Campbell, the defendant's conviction for sale of cocaine was reversed and remanded for a new trial after this Court found that the jury was improperly permitted to hear repeated references to other charges pending against Campbell. Campbell, 750 So.2d at (ś 13). The present case is distinguishable from Campbell, however, in that the State's reference to Gray's prior arrest was not for the purpose of prejudicing the jury, but was admitted to show motive. Admission for such purpose is permitted by Rule 404(b) of the Mississippi Rules of Evidence:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
(emphasis added). In the present case, the State's case rested upon proving that Gray's motive for approaching the victims' car was to follow through on his prior threat to pay them back for what he thought was their "snitching" to the police.
ś 6. The judge stated on the record that he had conducted the required balancing test and had found that the probative value outweighed the prejudicial affect. Gray has failed to show that the trial court abused its discretion, and we find no error here.
II. DID THE TRIAL COURT ERR IN FAILING TO GIVE A LIMITING INSTRUCTION REGARDING EVIDENCE OF GRAY'S FORMER DRUG ARREST?
*263 ś 7. Gray also argues that the trial court should have given the jury a limiting instruction concerning evidence of his prior arrest. The record contains discussion between the attorneys and the judge concerning which instructions to give and which to reject. At no place in the discussion does the subject of a limiting instruction arise. Despite defense counsel's failure to request such instruction, a question remains concerning whether or not the court, on its own motion, was required to give an instruction. The supreme court states that the better practice is for the trial judge to grant a limiting instruction sua sponte when proper request is not made by counsel. Robinson v. State, 735 So.2d 208(ś 10) (Miss.1999). However, in Bishop v. State, 771 So.2d 397 (Miss.Ct. App.2000), this Court clarified the rule from Robinson:
While we recognize the clear holding in Robinson that it was reversible error for the trial court not to have given sua sponte a limiting instruction on the facts of that case, we do not read Robinson to pronounce a per se reversible error rule when the trial court fails to give sua sponte the required limiting instruction, nor do we read Robinson to exclude such error from the harmless error analysis. Thus, we look at the facts of our case to determine whether the failure to give the required limiting instruction is harmless error.
Bishop, 771 So.2d at (ś 15). In Bishop, the charge was uttering a forgery and the prior act sought to be introduced concerned false pretenses and embezzlement convictions. Id. at (ś 8). We determined that the court's failure to give a limiting instruction was harmless error as ample other evidence existed to support the conviction. Id. at (ś 11). We find the same to be true in the present case. Gray did not request a limiting instruction, and although the court arguably erred in failing to give an instruction sua sponte, we find such error to be harmless as abundant other evidence existed to support the verdict. Thus, we find no merit to this issue.
III. DID THE TRIAL COURT COMMIT ERROR IN REFUSING GRAY'S REQUESTED MANSLAUGHTER INSTRUCTION?
ś 8. Gray claims that the court erred in failing to give his requested instruction on manslaughter as a lesser-included offense. He claimed that since his defense was two-pronged, one theory being self-defense and the other theory being manslaughter, the court should have allowed the instruction. The State counters that no evidence supported his supposed manslaughter defense; thus, the court did not err in refusing the instruction.
ś 9. The record is void of any evidence from which the jury could have determined the killing resulted from heat of passion. Gray points to the testimony of Augustine McClellan who, after the shooting, observed the car in which the victim was found. McClellan testified that one of the victims, Ladell Lay, was sitting in the car and had a can of beer in his right hand. Alonzo Cooper, the other victim, testified that he was in the car when Gray shot Lay, and Lay had his hand on the gear shift. Gray now claims on appeal that the discrepancies in these two testimonies prove that at some point Lay must have made a movement from the can to the gear shift, which would support Gray's theory that he thought Lay's movement indicated he was reaching for a gun, which caused Gray to respond in the heat of the passion in shooting at Lay.
ś 10. Gray states that it is not necessary that the quality of the proof in support of his theory rise to any certain level of credibility or that some minimum quantum of proof be developed, and even the *264 flimsiest of evidence, so long as it has some probative value, is enough to permit him to have the jury instructed on his theory of the case. See Hester v. State, 602 So.2d 869, 873 (Miss.1992). While we recognize this rule, we find that Gray has not presented evidence to show that a manslaughter instruction should have been given. The evidence to which Gray points, specifically McClellan's and Cooper's testimonies, only show that Gray could have acted in self-defense in shooting Lay, thinking that with Lay's quick movement he was reaching for a weapon. Thus, we find he has failed to present any proof to support a manslaughter instruction.
ś 11. In Phillips v. State, 794 So.2d 1034 (Miss.2001), the supreme court addressed a similar issue on appeal concerning whether or not a manslaughter instruction should have been given. In that case, the court looked to the definitions of manslaughter and heat of passion in finding that the court did not err in failing to give a manslaughter instruction:
Manslaughter committed in the heat of passion is defined in Miss.Code Ann. § 97-3-35 as, "the killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense...." Heat of passion has been defined as, A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
This passion should be an emotion brought about by some insult, provocation, or injury, which would produce in the minds of ordinary men "the highest degree of exasperation." We have stated that words alone and disagreements among people are not enough to invoke the passion required for this defense. "Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter."
Phillips, 794 So.2d at (śś 9-10) (citations omitted). Applying the supreme court's finding in Phillips to the present case, we cannot find that the testimonies of McClellan and Cooper provide enough information as to warrant any suspicion that Gray may have shot Lay in the heat of passion, which could support a manslaughter conviction. The trial judge discussed in detail with the attorneys whether or not the manslaughter instruction was appropriate in this case, and despite repeated attempts by Gray's attorney to convince the judge that such instruction was needed, the judge ultimately found that no evidence existed to support such instruction.
A murder defendant is not entitled to a manslaughter instruction where the record contains no evidence from which the jury could determine that the killing resulted from heat-of-passion and not the result of malice. A defendant's statement that he wanted to kill the victim made prior to the fatal stabbing was evidence of malice.
Dobbins v. State, 766 So.2d 29 (ś 11) (Miss. Ct.App.2000) (citations omitted). The record shows that Gray made threats against those he believed "snitched," and we find these statements show Gray's malicious state of mind which, according to Dobbins, negate his ability to refute such inference. We find no error with the judge's actions, *265 and we affirm his decision to reject the manslaughter instruction.
IV. DID THE TRIAL COURT ERR IN REMOVING A JUROR AND REPLACING HER WITH AN ALTERNATE?
ś 12. This issue concerns a situation that arose on the third day of trial which caused the State to move for the dismissal of one of the jurors, Edneatha Williams. Gray now argues that the court failed to state a reason for dismissing the juror in accordance with Miss.Code Ann. § 13-5-67 (Supp.2001). ("Alternate jurors... shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties."). Gray argues this juror did not become unable or disqualified to perform her duties.
ś 13. Williams was removed towards the end of trial after the State found that she had an indirect relationship with Gray, which information was not brought out pre-trial. The facts show that during recesses in the trial when the jury was not in the box, a spectator at the trial, Antonio Harvey, visited the defense table and appeared to be reviewing documents with Gray and his attorney. From the transcript, it is unclear as to the relationship Williams had with Antonio Harvey. The following excerpt is taken from the transcript of Assistant District Attorney Rossi's in-chambers examination of Investigator David James at the beginning of day three of the trial.
ROSSI: For the record, would you state your name and occupation, please?
JAMES: David James, Jr., State Criminal Investigator, Eleventh Circuit Court District.
ROSSI: Mr. James, did you have an opportunity this morning to speak to a spectator in the courtroom, I believe his name is Antonio Harvey?
JAMES: I did.
ROSSI: And if you would, relate to the Courtâ 
BY THE COURT: What is his name, by the way?
BY MR. ROSSI: The spectator?
BY THE COURT: Yes.
BY MR. ROSSI: Antonio Harvey.
BY THE COURT: Go ahead.
ROSSI: (Mr. Rossi continued): Could you relate to the Court what that conversation was about. If you would just start at the beginning and takeâ go through the conversation.
JAMES: I approached him. I talked to him as if he already knew me from the past or whatever. I started a conversation about his girlfriend and asked him basically were they still dating or whatever. And he told me, yes. And I said, "yeah, you know the young lady that is still on the jury." I said Edweetha, Adleatha. I was trying to get him to say the particular name or whatever. He said, "oh, yeah, I know who you are talking about." He said, "yeah, we're still kicking." And that was his conversation.
BY THE COURT: We are still what?
BY MR. JAMES: Kicking it. That's a street term meaning that they are still dating or they're still seeing each other, or they have some kind of contact.
BY THE COURT: Okay.
BY MR. JAMES: Kicking it.
BY THE COURT: I need an interpreter every now and then.
ROSSI: (Mr. Rossi continued) Is that the extent of the conversation?
JAMES: That was the extent of it.
Ms. Mitchell, another officer of the court, also told the judge that she overheard the *266 conversation between James and Antonio Harvey to which Harvey told James he was "kicking" with Williams.
ś 14. Before the jury was sent to deliberate, the judge called Juror Williams into chambers to ask exactly what was going on with Antonio Harvey and to determine if Williams indeed had some connection to Antonio Harvey or to Gray.
THE COURT: Ms. Williams, it's been brought to the attention of the Court that you may know one of the persons who is a friend, I would say, of the defendant in this case; that is, Mr. Harvey? Is that correct? Is he the person that is a spectator out there? How well do you know Mr. Harvey?
WILLIAMS: Well, I just met him about two or three months ago.
THE COURT: Do y'all see each [other] or date or that sort of thing?
WILLIAMS: No, not him. No, uh-uh.
THE COURT: Who then?
WILLIAMS: Well, I was talking to his brother. His brother.
THE COURT: What do you mean "talking to" his brother?
WILLIAMS: Well, we was dating.
THE COURT: You were dating the brother of this Mr. Harvey?
WILLIAMS: Yeah.
THE COURT: The one who's been sitting as a spectator?
WILLIAMS: Yes. He just came in yesterday.
THE COURT: All right. I'm still not sure. Mr. Harvey has a brother who is also Mr. Harvey, I presume?
WILLIAMS: The dude that I was dating his brother, his name was Karlus. I was dating his brother, Karlus.
THE COURT: Mr. Harvey's brother you are talking about?
WILLIAMS: Yes, Karlus. I was dating his brother Karlus.
THE COURT: Okay. You know Mr. Harvey?
WILLIAMS: Talking about theâ out there.
THE COURT: Yes.
WILLIAMS: Yeah, I know him through his brother.
THE COURT: And you have dated his brother?
WILLIAMS: Yes.
THE COURT: And you do knowâ well, you've already told the Court that you knew the defendant?
WILLIAMS: Yeah. I know of him, but I don't know him personally.
THE COURT: But you do know Mr. Harvey?
WILLIAMS: Karlus.
THE COURT: But you do know Mr. Harvey also?
WILLIAMS: The one out there?
THE COURT: Yeah.
WILLIAMS: Yeahâ yes, sir. I just seen him when I used to go over there and visit his brother.
After this exchange, Williams told the judge that she broke up with Karlus Harvey, Antonio's brother, a couple of days before trial and that she casually knew Antonio. She affirmed that she could be fair in deciding the case. The judge told her that although he appreciated her effort, out of caution he could not take a chance, especially since he had four capable alternate jurors, one of whom could serve as a replacement for her. He then dismissed Williams from the panel.
ś 15. With the initial voir dire, Williams was individually questioned by the attorneys and the judge, since she stated she had previously heard about the case. However, at the time of voir dire, neither *267 the State nor the defense had any way of knowing they should question Williams concerning her relationship to Antonio Harvey, since at the time of voir dire, it was not known that Antonio Harvey would appear at trial and talk with Gray as he repeatedly did. As reflected in the transcript, the State explained that, had they known at the time of selecting the panel that Williams had this "indirect" connection to Gray, she certainly would have not been selected. Regardless, the information only came out during the trial at which time the State promptly moved to remove her from the panel. Williams apparently knew both Antonio Harvey and Harvey's brother, Karlus, who the record shows had fathered two of her children. Whether or not Williams had a dating relationship with Antonio is unclear. However, the circumstances still show that Williams had an indirect relationship to Gray which we find justifies the judge's decision, as explained herein.
ś 16. "The dismissal of a juror for good cause and her replacement with an alternate is within the sound discretion of the trial judge." Horton v. State, 726 So.2d 238(ś 41) (Miss.Ct.App.1998). This was a judgment call on the judge's part. It is unfortunate that this information was not available pre-trial when there would have been little or no question but to exclude Williams from the panel. However, caselaw mandates that Gray must prove that he was prejudiced by the court's decision to replace Williams with an alternate. Vaughn v. State, 712 So.2d 721(ś 15) (Miss.1998). Gray has failed to make such showing, and we find no error with the judge's decision to remove the juror.
V. DID THE CUMULATIVE IMPACT OF ALL ERRORS REQUIRE REVERSAL OF THE CONVICTION?
ś 17. Gray finally argues that the cumulative impact of the errors alleged on appeal denied him a fair trial. Having found no merit to any other issues previously addressed with this appeal, we cannot find that Gray was denied a fair trial. This issue has no merit.
ś 18. THE JUDGMENT OF THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF BOLIVAR COUNTY OF CONVICTION OF COUNT I, MURDER AND SENTENCE OF LIFE AND COUNT II, AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS, SAID SENTENCES TO RUN CONCURRENTLY, BUT CONSECUTIVELY TO ANY SENTENCES PREVIOUSLY IMPOSED, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. KING, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY IRVING, J.
KING, P.J., dissenting.
ś 19. I believe the majority opinion to be wrong, and therefore, dissent.
ś 20. About September 10, 1998, Gray approached a car in which Ladell Lay and Alonzo Cooper were sitting. After exchanging words, Gray is alleged to have pulled a gun and shot Lay and Cooper. Lay died of a gunshot wound to the head, while Cooper's wound was not fatal.
ś 21. Gray was tried for murder and aggravated assault, beginning June 7, 1999. The trial was before a jury, which was duly empaneled after voir dire and the *268 exercise of challenges for cause and peremptory challenges.
ś 22. Among the persons accepted for jury service, without objection, was Edneatha Williams. However, on the third day of trial, the State asked to have Williams replaced as a juror saying:
There is a jurorâ Juror Number 2 on the panel, also Juror Number 2 in the petit juryâ Aneatha [sic] Williams, whoâ 
BY THE COURT: Juror Number 2?
BY MR. ROSSI: Yes, sir.
BY THE COURT: What is her name?
BY MR. ROSSI: Aneatha [sic] Williams.
BY THE COURT: All right.
BY MR. ROSSI: And there is a spectator in the courtroom named Antonio Harvey. Mr. Harvey has been here throughout the trial, and he is friends with the defendant, Mr. Gray. At every break that we have had, he comes up to counsel table and sits with Mr. Gray and talks to him about whatever it is that they are talking about, throughout this trial.
Juror Numberâ it is my understanding that Juror Number 2 is the girlfriend of Mr. Harvey. In fact, there is some children by, I believe it is, Mr. Harvey's brother that Ms. Williams has. And it is certainly obvious that Mr. Harvey is aligned with Mr. Gray in this case. Ms. Williams did not indicate at all that she was friends with or had any type of relationship or connection to Mr. Gray.
As proof of these allegations the State offered the testimony of its investigator that during each recess, when the jury was out of the courtroom, he observed Antonio Harvey going up to counsel table and talking with the defendant. Based upon that observation, the investigator initiated a conversation with Harvey, the substance of which was as follows:
MR. JAMES: I approached him. I talked to him as if he already knew me from the past or whatever. I started a conversation about his girlfriend and asked him basically were they still dating or whatever. And he told me, yes.
And I said, "yeah, you know the young lady that is still on the jury." I said Edweetha, Adleatha. I was trying to get him to say the particular name or whatever.
He said, "oh, yeah, I know who you are talking about." He said, "yeah, we're still kicking."
And that was his conversation.
BY THE COURT: We are still what?
BY MR. JAMES: Kicking it. That's a street term meaning that they are still dating or they're still seeing each other, or they have some kind of contact.
BY THE COURT: Okay.
BY MR. ROSSI: Kicking it.
BY THE COURT: I need an interpreter every now and then.
Q. (Mr. Rossi continued): It that the extent of the conversation?
A. That was the extent of it.
Q. Okay. Did you approach him based on information that you received afterâ 
BY THE COURT: Do you have testimony about theâ you're alleging that Antonio Harvey has met with the defendant throughout the trial and that sort of thing? How do you intend to prove that?
ś 23. Miss.Code Ann. § 13-5-67[1], allows for the replacement of a juror who *269 becomes unable or disqualified to perform his duties. There has been no suggestion that Williams was unable to perform her duties. Therefore, the question faced by the trial court, and now this Court, is whether Williams was disqualified from performing her duties. Where the issue is not one of whether the juror meets the statutory qualifications of Section 13-5-1, disqualified is used synonymously with "good cause." Myers v. State, 565 So.2d 554, 558 (Miss.1990).
ś 24. "Good cause" may be found where a juror during voir dire withheld information, or misrepresented material facts. Id. at 558. However, such a finding is possible only where (1) the question propounded to the juror was relevant to the voir dire examination, (2) the question was unambiguous, and (3) the juror had substantial knowledge of the information sought to be elicited. Odom v. State, 355 So.2d 1381, 1383 (Miss.1978).
ś 25. In asking that Williams be removed, the State alleged that when questioned during voir dire Williams hid her relationship to Gray, and as such was disqualified. The specific statement from the State was, "Ms. Williams did not indicate at all that she was friends with or had any type of relationship or connection to Mr. Gray."
ś 26. The record before this Court is devoid of any evidence of a relationship between Gray and Williams. The State attempts to skirt this problem by suggesting that Williams had a relationship with Antonio Harvey, who in turn knew Gray. Williams, under oath, denied a relationship with Harvey, but stated she knew him from having dated his brother. Likewise, she denied under oath having any relationship with Gray. Williams' denial of a relationship with Harvey or Gray is the only clear and credible evidence in the record on this issue.
ś 27. The record of voir dire does not indicate any clear and unambiguous questions propounded to Williams requesting information about any possible relationship between Williams and Harvey, or any other persons, who knew Gray about which there is evidence that her answers were evasive, incomplete, inaccurate or inscrutable.
ś 28. Where the State, as in this case, infers that Williams was dishonest in her answers, it bears the burden of establishing (1) that a question relevant to the voir dire was propounded to Williams, (2) that the question propounded to Williams was *270 clear and unambiguous, (3) that Williams had substantial knowledge of the information requested by the question, and (4) that Williams answer, if less than responsive was prejudicial to the State. Lewis v. State, 580 So.2d 1279, 1283 (Miss.1991). The only questions asked of Williams which even remotely touched on this issue were asked in chambers, and they were asked because she acknowledged having heard about this case. Those questions were as follows:
EXAMINATION BY THE COURT:
Q. Ms. Williams, you indicated that you had heard something about this case; is that right?
A. Yes, sir.
Q. Can you tell us where did you hear it from?
A. Well, I was in the hospital. I had just had my baby. And my baby's daddy had told me of Maurice Gray had shot Ladell Lay. That's all he said.
Q. That was my next question. What did you hear? And you heard somebody say that Maurice Gray had done what?
A. Shot Ladel Lay.
Q. okay. Did you hear anything else?
A. No, because I was in the hospital.
Q. Later on, have you heard anything else?
A. No.
Q. That's all you've heard about it?
A. (Witness moved head up and down.)
BY THE COURT: Y'all want to ask any questions?
BY MR. WALLS: Just one question.
BY THE COURT: I need to follow up.
Q. (The Court continued): Can you lay aside what you just stated and try this case on what happens in the courtroom, not in the hospital, but in the courtroom?
A. Yes, sir.
Q. You can do that?
A. Yes, sir.
BY THE COURT: Now, do y'all have any questions?
BY MR. WALLS: I have no questions.
EXAMINATION BY MR. ROSSI:
Q. Do you know Mr. Gray at all?
A. Well, I know, you know, I seen him walking by: but I don't know nothing about him.
BY MR. ROSSI: I don't have any other questions, Judge.
BY THE COURT: Okay. you can step outside.
ś 29. The State did not meet the burden of showing Williams to be disqualified for jury service in this case. The State did not establish (1) that a question relevant to the voir dire was propounded to Williams, (2) that the question propounded to Williams was clear and unambiguous, (3) that Williams had substantial knowledge of the information requested by the question, and (4) that Williams answer, if less than responsive, was prejudicial to the State. Williams was not disqualified from jury service, McNeal v. State, 617 So.2d 999, 1003 (Miss.1993), and it was therefore error for that trial court to remove her from the jury three days into the trial.
ś 30. Because the State failed to establish that Williams was disqualified from serving on the jury, the decision to remove her from the jury under these circumstances was the equivalent of providing the State with an additional peremptory challenge. The decision to remove Williams from the jury improperly tipped the balance of fairness to favor the State, and was therefore an abuse of discretion.
*271 ś 31. I would accordingly reverse and remand for a new trial.
ś 32. The majority agrees that the evidence on this issue "is unclear." Despite this lack of clarity, it defends its decision by saying, "However, the circumstances still show that Williams had an indirect relationship to Gray...." They first describe this relationship as knowing someone who knew Gray, a third degree relationship. They now define this relationship as knowing the brother of someone who knew Gray. That is at best a fourth degree relationship.
ś 33. The majority also alleges that had the State been aware of this fourth degree relationship, it would have exercised a challenge against her. The majority states that because the State was unaware of this relationship, it did not inquire about it and did not challenge Williams. The inference being that Williams somehow prevented the State's inquiry into this matter. Such logic is akin to blaming a victim of rape for being born a female. It makes no sense.
ś 34. The State could have with all ease asked, "Does anyone here know anyone who knows the defendant." If the answer was yes, then an appropriate followup question could be asked.
ś 35. One of the simple truisms of voir dire is that you cannot fault a person for not responding to a question not asked. McNeal v. State, 617 So.2d 999, 1003 (Miss.1993); Myers v. State, 565 So.2d 554, 557-58 (Miss.1990). The State did not ask, and now seeks to fault Williams for what it did not do.
IRVING, J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Miss.Code Ann. Section 13-5-67 (Supp. 2001), Alternate jurors impaneled: Except in cases in which jury selection and selection of alternate jurors is governed by rules promulgated by the Mississippi Supreme Court, whenever, in the opinion of a circuit judge or chancellor presiding in a case in which a jury is to be used, the trial is likely to be a protracted one, such circuit judge or chancellor, in his discretion, may direct that one (1) or two (2) jurors in addition to the regular panel be called and impaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges for cause, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged at the time the jury retires to consider its verdict. In capital cases the defendant and the state shall each be allowed two (2) peremptory challenges to alternate jurors in addition to those otherwise provided by law. In all other cases each party shall be allowed one (1) peremptory challenge to alternate jurors in addition to those otherwise provided by law. In any criminal case all peremptory challenges by the state shall be made before the alternate juror is presented to the defendant. The additional peremptory challenges provided for herein may be used against an alternate juror only, and other peremptory challenges allowed by law may not be used against an alternate juror.