# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-KA-01396-SCT

*SANDRA D. SEWELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/93 |
| TRIAL JUDGE: | HON. RICHARD T. WATSON |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EVERETT T. SANDERS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: EDWIN A. SNYDER |
| DISTRICT ATTORNEY: | RONNIE L. HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | CONVICTION AFFIRMED, SENTENCE REVERSED AND REMANDED - 10/15/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/16/98 |

**BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

## SUMMARY

¶1. This case arises on appeal from the Circuit Court of Wilkinson County. On July 17, 1993, Sandra D. Sewell was found guilty of eight counts of voter fraud, having allegedly attested voter forgeries on absentee voter applications and ballot envelopes. Sandra Sewell's compiled sentence totaled eight years in the custody of the Mississippi Department of Corrections and $2,000 in fines.

¶2. After a careful review of the record and the briefs in this matter, we affirm the conviction of Sandra Sewell. However, finding that the trial judge imposed a sentence upon Sandra Sewell beyond what is authorized by the statute, we reverse her sentence and remand her cause to the lower court for re-sentencing in accordance with the statute.

## STATEMENT OF THE FACTS

¶3.The instant case has its genesis in the 1991 elections in Wilkinson County, in which a large number of absentee ballots were cast, resulting in a lengthy investigation by the attorney general's office. Indeed, the Circuit Clerk, a veteran of more than twenty-four (24) years in office, testified that he "never had as many absentee ballots in the first twenty years as I had the...last four years."

¶4. In order to vote an absentee ballot by mail, the voter must obtain an "Application for Absentee Elector's Ballot" (ballot application) from the circuit clerk and return the completed application to the circuit clerk's office. An "official authorized to administer oaths" must attest to the ballot application by the elector, the attestation being the issue in Counts III through VIII. The clerk mails the ballot and a ballot envelope to the address indicated on the ballot application, usually within twenty-four hours of receiving the completed ballot application. Sometimes the ballot and ballot envelope are mailed along with the application to an address provided to the clerk. An "Electors Certificate" is on the back of the ballot envelope which must be signed by the voter and attested to, this attestation being the issue of counts I and II. When the ballot is returned to the clerk in the ballot envelope, the sealed envelope containing the ballot is attached to the ballot application and both are held until such time as they are placed into the precinct box and sent to the polling place. Any decision as to the sufficiency of the ballot application is made by the poll workers, not the clerk. The ballot envelope is opened at the precinct and the absentee ballot mixed with the regular ballots. Therefore, the absentee ballot is no longer associated with any particular voter. After the votes are tabulated on election day, the precinct boxes containing the ballots are returned to the clerk, and the boxes are sealed and stored. These forms and procedures are specified in Mississippi Code Annotated sections 23-15-627, 23-15-631, 3-25-715 and 23-15-635.

¶5. The primary election during this particular election cycle occurred on September 17, 1991, followed by the second primary (run-off) on October 8, 1991. The same ballot was used for both elections because there was insufficient time for new ballots to be printed. The specific race at issue in the instant case was the October 8, 1991, run-off contest between Calvin McFarland ("candidate McFarland") and Louis Gaulden, both candidates for supervisor of district one. Candidate McFarland, who was seeking re-election and was also convicted of voter fraud[1], lost the election by 34 votes. According to testimony, candidate McFarland was actively engaged in the absentee balloting process, so much so that the deputy circuit clerk described the delivery of ballot applications by candidate McFarland as being "in bulk". Candidate McFarland was also the only person to deliver to the clerk's office ballot applications which had been attested by Sandra D. Sewell ("Sewell") as a notary public.[2]

¶6. During the special November, 1992, term of the Circuit Court of Wilkinson County, the grand jury returned an indictment against Sewell, charging eight counts of voter fraud in violation of Mississippi Code Annotated section 23-15-753, as amended, and the indictment was filed on December 4,1992.[3] Counts I and II of the indictment charged that Sewell aided and abetted candidate McFarland by attesting to forged signatures on ballot envelopes. Counts III-VIII charged that Sewell aided and abetted candidate McFarland by attesting to forged signatures on ballot applications. All of the names in question represent registered voters in Wilkinson County supervisor district one and all of the documents comprising these eight counts were attested to by Sewell as a notary public. The initial trial in March of 1993, ended in mistrial after witness Betty McGraw, also indicted for voter fraud, died on the stand. This matter was tried again on July 15 through 17, 1993.

## Counts I and II

## Ballot Envelopes

*Testimony Pertaining to Counts I and II. Gordon McFarland* and *Minnie McFarland.*

¶7. The State presented at trial Gordon McFarland, who happens to be the uncle of candidate McFarland, who testified that: in September and October of 1991, he was living in New Orleans; Minnie McFarland, his wife, was living in Chicago; neither of them ever lived at 3805 Houma Boulevard, Metairie, Louisiana, which was listed as their address on the ballot application and envelope; he had never applied for an absentee ballot; the signatures purporting to be that of "Gordon McFarland" on the ballot application and ballot envelope marked Exhibit S-1 are not his; and, he voted at the polls, not by absentee ballot.

¶8. Pam Schwartz testified for the State that she was the accounts leasing manager of Camelot Apartments, the address of which is 3805 Houma Boulevard, Metairie, Louisiana; and, that she was the custodian of the lease and payment records of this apartment complex. According to Schwartz, during the period between July 17, 1989, and July 31, 1992, Patricia McFarland (candidate McFarland's sister), leased and was the only occupant of apartment A-215.

¶9. Frank Hicks[4] ("Hicks"), the State's handwriting expert, testified that he had strong reason to believe that Sewell was the writer of the "Sandra D. Sewell" attestation signatures in Exhibits S-1 and S-2[5].

## Counts III - VIII

## Ballot Applications

*Testimony Pertaining to Count III. Lisa Brown*

¶10. Leish "Lisa" Brown, a student residing in Jackson who had worked for candidate McFarland during the summer of 1991, testified that she did not sign the ballot application marked Exhibit S-3, nor did she authorize anyone else to do so. Further, she testified that she did not know Sewell and had never signed her name in the presence of Sewell. According to Brown, she received a ballot and signed the ballot envelope, which is part of Exhibit S-3, but she had never requested this ballot.

¶11. Hicks testified that he had made a positive identification that candidate McFarland was the writer of the"Lisa Brown" signature on the ballot application in Exhibit S-3. Further, he testified he had made a positive identification that Sewell was the writer of the "Sandra D. Sewell" attestation signature on this exhibit.

*Testimony Pertaining to Count IV: Cassie L. Neyland*

¶12. Milton Neyland testified for the State that he was the husband of Cassie L. Neyland for some 52 years and that she suffered from diabetes and poor circulation leading to the amputation of a leg. He stated that he was familiar with her handwriting. After examining the "Cassie L. Neyland" signature on the ballot application marked Exhibit S-4, he testified that it was not his wife's writing; it was not his handwriting; he did not know who wrote the signature; and, he did not know Sewell.

¶13. According to Hicks's testimony, he made a positive identification that candidate McFarland was the writer of the "Cassie L. Neyland" signature on Exhibit S-4. He also made a positive identification that Sewell was the writer of the "Sandra D. Sewell" attestation signature on Exhibit S-4.

*Testimony Pertaining to Counts V and VI. S. P. Turner* and *Louise Turner.*

¶14. Willie Turner, the son of Louise and S.P. Turner, testified that his parents were in an "old folks home" in Hammond, Louisiana, on September 19, 1991, the day that Louise Turner purportedly signed the ballot application marked Exhibit S-5, and the day S.P. Turner purportedly signed the ballot application marked Exhibit S-6. According to Willie, Louise Turner did not sign Exhibit S-5 because she could not write and used an "X" for her signature. Additionally, Willie also declared that S.P. Turner did not sign Exhibit S-6 because he could not write and likewise signed with an "X." On cross-examination, when Sewell's counsel insinuated that the mark with straight, crossed lines to the far left of the signature was S.J. Turner's "X," Willie maintained that "[t]hat's not my father's 'X' . . .[h]is hands tremble; he couldn't hardly make an 'X'." Willie testified that he recognized the voter's address on the application as his parents. However, he stated that the mailbox had been removed shortly after his parents had moved to the nursing home and that no mail was being sent to the Wilkinson County address.

¶15. Mike Wunnenberg, the administrator of Heritage Manor Nursing Home in Hammond, testified that S.P. and Louise Turner had been residents of the nursing home since May 23, 1991, as confirmed by Exhibits S-9 and S-10, which were nursing home records for the month of September, 1991.

¶16. Hicks testified that he had made a positive identification that candidate McFarland was the writer of the "Louise Turner" signature on Exhibit S-5. Further, he stated that he had made a positive identification that Sewell was the writer of the "Sandra D. Sewell" attestation signature on Exhibit S-5. Additionally, Hicks maintained that he had strong reason to believe that candidate McFarland was the writer of the "S.P. Turner" signature on Exhibit S-6. Hicks also declared that he had made a positive identification that Sewell was the writer of the "Sandra D. Sewell" attestation signature on Exhibit S-6.

*Testimony Pertaining to Count VII. Eric R. Stewart.*

¶17. Eric Reshon Stewart, who had once lived on the same street as candidate McFarland, testified, after examining the "Eric R. Stewart" signature on the ballot application marked Exhibit S-7, that he did not sign the ballot application; he did not authorize anyone else to sign it; he does not know Sewell; and, he has never signed any document in her presence nor asked her to attest to any such document. He testified that the address on the application was his address in September, 1991, except that "P.O. Box 364" was not part of his address.

¶18. Hicks testified that he had a strong reason to believe that candidate McFarland was the writer of the "Eric R. Stewart" signature on Exhibit S-7 and further stated that he had made a positive identification that Sewell was the writer of the "Sandra D. Sewell" attestation signature on Exhibit S-7.

*Testimony Pertaining to Count VIII. Lottie James.*

¶19. Wevlyn James, the Wilkinson County Tax Assessor/Collector, and one of the persons indicted for vote fraud who pleaded guilty to the charges, testified that Lottie James was her grandmother. According to Wevlyn, her grandmother, who passed away before the trial, was living in New Orleans with her daughter during September and October of 1991. Wevlyn stated that she was familiar with Lottie's handwriting, and after examining Exhibit S-8, testified that the signature on the ballot application and the signature on the ballot envelope, not involved in this count, were not Lottie's signatures. Wevlyn testified that, shortly before the October 8th election, she received a telephone call from candidate McFarland, who asked if he could have a ballot sent out for Lottie. According to Wevlyn, a ballot application was then mailed to her parent's home, which is the address on the application. Thereafter, Wevlyn stated that she took the ballot and ballot envelope and put them, unmarked and unsigned, in candidate McFarland's car. She testified that she had not seen the ballot application at any time during these events and did not know who signed it.

¶20. Hicks testified that he had made a positive identification that Calvin McFarland was the writer of the "Lottie James" signatures on both the ballot application in Exhibit S-8 and the ballot envelope, and that he had made a positive identification that Sewell was the writer of the "Sandra D. Sewell" attestation signature on the ballot application in Exhibit S-8.

¶21. On July 17, 1993, the jury found Sewell guilty on all eight counts of vote fraud, deliberating less than one and one-half hours. On August 2, 1993, the court sentenced Sewell on Count I to five years and a $1,000 fine and on Count II to five years and $1,000 fine with two years suspended and Count II to run consecutively to Count I, with the total sentence under Counts I and II being eight years and $2,000 in fines. The sentences for Counts III through VIII were five years on each count, to run concurrently with Counts I and II.

¶22. Sewell, on August 13, 1993, filed a Motion for New Trial and/or Judgment Notwithstanding the Verdict. A hearing on the motion was held on October 25, 1993. The judge denied the motion. At that time, Sewell made an Ore Tenus Motion to reduce her sentence and the judge, likewise, denied that motion.

¶23. On December 9, 1993, Sewell filed her Notice of Appeal and a Designation of Record.

## DISCUSSION OF THE LAW

¶24. Sewell has advanced numerous assignments of error, only four of which warrant our discussion here.

> **I. WHETHER THE TRIAL COURT DEPRIVED DEFENDANT OF HER CONSTITUTIONAL RIGHT TO DUE PROCESS IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTION 14 OF THE MISSISSIPPI CONSTITUTION BY THE ARBITRARY JURY SELECTION PROCESS.**

¶25. In this assignment of error, Sewell alleges that jury selection procedure was arbitrary and that the trial court misapplied the law regarding jury selection, resulting in the violation of her due process rights as guaranteed by the constitutions of the United States and the State of Mississippi. The crux of this assignment of error is that the trial court arbitrarily granted and denied both challenges for

cause and peremptory challenges to Sewell's detriment.

¶26. By way of background for the discussion of jury selection, *infra*, only one of the fourteen persons originally indicted on charges stemming from vote fraud was white, that being Betty McGraw, who died on the witness stand in Sewell's earlier trial; the remainder were black. Additionally, 37 of the 53 potential jurors (almost 70%) on the venire were black. The ultimate racial makeup of the jury was 11 blacks and 1 white, with a black alternate and a white alternate.

## A. WHETHER THE COURT WAS ARBITRARY IN PERMITTING AND DENYING CHALLENGES FOR CAUSE.

¶27. Sewell asserts that the trial court was arbitrary in the jury selection process by denying her for cause challenges of jurors Phyllis Jeter and Phyllis Green, who were white, while granting the State's for cause challenges of juror Cherry Dunbar, a black, for the same or similar reasons. Sewell's argument is entirely fact-driven, as she has cited no supporting authority.

¶28. The method of selecting a jury is within the sound discretion of the trial judge, except in circumstances where the method is set by statute. ***Peters v. State***, 314 So.2d 724, 728-29 (Miss.) *cert. denied,* 423 U.S. 1019(1975). Also, the two jurors in question were ultimately removed by peremptory strikes exercised by Sewell. This Court has held that no reversible error results when the trial court fails to sustain a challenge for cause, and the juror(s) at issue is ultimately excused with a peremptory challenge. ***Lester v. State***, 692 So.2d 755, 790-93 (Miss.1997); *see also* ***Holland v. State***, 705 So.2d 307, 338 (Miss.1997).

¶29. For these reasons, we find that the trial judge did not abuse his discretion in his grant or denial of challenges for cause; and, therefore, did not abridge Sewell's due process rights under the United States and Mississippi Constitutions.

## B. WHETHER THE TRIAL COURT WAS ARBITRARY IN ITS APPLICATION OF THE LAW ON PEREMPTORY CHALLENGES.

¶30. Sewell contends that the trial court improperly applied our law regarding peremptory challenges by applying disparate standards to the ***Batson*** inquiry requested by both parties. She argues that the judge required her to justify her peremptory challenges while not requiring the State to justify its peremptory challenges under what she perceives to be similar uses of the challenges. The inquiry with regard to this assignment of error requires a review of the trial court's application of our ***Batson*** law.

¶31. The availability of peremptory challenges is not a matter of constitutional right, but the use of such challenges, when available, must be constitutional. The genesis of current jurisprudence regarding peremptory challenges is ***Batson v. Kentucky***, 476 U.S. 79 (1986). In ***Batson***, the United States Supreme Court held that a prospective juror may not be struck by the prosecution in a criminal case simply because that juror is black. ***Batson*** protection has been extended to strikes exercised by the defense, as in the instant case. ***Georgia v. McCollum***, 505 U.S. 42 (1992); ***Griffin v. State***, 610 So. 2d 354, 356 (Miss. 1992).

¶32. The Supreme Court recently outlined the ***Batson*** analysis in ***Hernandez v. New York***:

First, the [opponent of the strike] must make a prima facie showing that the [proponent] has

exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the [opponent] to articulate a race-neutral explanation for striking the jurors in question. Finally the trial court must determine whether the [proponent] has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)(citations omitted).

¶33. In the case *sub judice*, the State's first tender to Sewell was twelve jurors, three whites and nine blacks. The State exercised peremptory challenges on two of this panel, both black males. Sewell used five strikes on this panel, striking two blacks and three whites. Based upon Sewell's attempt to strike, for cause, 11 of the 14 whites on the venire, and the exercise of 3 of her peremptory strikes to remove every white potential juror on the tendered panel, the State raised a *Batson* challenge, requesting that Sewell justify the use of her peremptory challenges. Sewell raised her own *Batson* challenge, which the State characterized as a "retaliation-*Batson*" claim, and which the State contended was raised too late, as Sewell did not raise the claim at the time the panel was tendered. The trial judge, at that time, found that Sewell had not demonstrated that the State had engaged in a pattern of discrimination because the two blacks that the State had struck were replaced on the panel by two blacks. The court then required Sewell to go forward with her race-neutral reasons for her peremptory challenges and found her reasons to be acceptable.

¶34. The second panel tendered by the prosecution included the next five jurors on the list, with no State strike having been made. The first of these, prospective juror Janet Whitaker, was white and the remaining four were black. Sewell then struck the only white juror on the tendered panel, that being Whitaker. The State asked for, and the court required, Sewell to state a race-neutral reason for the challenge. Sewell stated that "we adopt the reasons that were articulated in our challenge for cause," adding that she was one of the jurors who would not "look me in the eye when I was interrogating them." The reasons put forth by Sewell during the for cause phase of jury selection were that "[h]er husband is in law enforcement; he's a game warden, and I might also add that she's employed by Wilkinson Christian Academy.... It's a segregated institution." With respect to Sewell's for cause challenge related to Whitaker's employment by a "segregated institution", the court had earlier responded, "No, Sir, it's not; I happen to know. I'll dispute you on the record on that; they publish in the paper; that's not cause; I'm not going to grant that challenge." As to the peremptory objection, the trial judge found "no reason in the world for excusing this juror", and that Sewell's attempted removal of all whites constituted a pattern of racial discrimination. He then reinstated Whitaker and allowed Sewell to use her sixth strike on another juror.

¶35. In the instant case, the State satisfied the first prong of the three step analysis by showing that Sewell used her peremptory strikes to strike every white on the panels tendered, which gives rise to a reasonable inference of purposeful discrimination. *Batson*, 476 U.S. at 94 ("the totality of the relevant facts gives rise to an inference of discriminatory purpose"). Furthermore, it is also clear that Sewell offered appropriately facially race neutral reasons for exercising the strike, thus satisfying step two of *Batson.* The disposition of this issue, therefore, turns on whether the trial judge abused his discretion in his finding that Sewell's race-neutral reasons as to juror Whitaker were pre-textual, the so named third prong of *Batson*.

¶36. This step in the analysis requires the trial court to determine if the opponent of the strike has

carried his overall burden of proving purposeful discrimination. *Hernandez*, 500 U.S. at 359. Determination of pretext at prong three turns on several specific findings similar to those at step one. *Stewart v. State,* 662 So.2d 522, 559 (Miss. 1995). Additionally, this Court has stated that the relative strength of the *prima facie* case of purposeful discrimination will often influence this inquiry. *Mack v. State*, 650 So.2d 1289, 1298 (Miss. 1994), *cert denied,* 116 S.Ct. 214 (1995).

¶37. Furthermore, this Court accords great deference to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason. *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995). This Court will not reverse a trial judge's factual findings regarding this issue "unless they appear clearly erroneous or against the overwhelming weight of the evidence." *Id.* (*quoting* *Lockett v. State,* 517 So. 2d 1346,1350 (Miss. 1987)).

¶38. In the instant case, Sewell exercised peremptory strikes against every white on the panels tendered by the State. The trial judge had ample evidence to determine that the reasons for objecting to Whitaker were pre-textual and we find that this determination is supported by the record.

¶39. As to Sewell's retaliation *Batson* claim regarding the State's use of its peremptory challenges, the trial judge found that there was no pattern of purposeful discrimination. The court noted that the two jurors challenged by the State were replaced on the panel by two blacks, thereby mitigating against a pattern of racial discrimination. Beyond that, Sewell tardily raised her *Batson* challenge. We cannot say that the trial judge abused his discretion finding that no pattern of racial discrimination was evident in the State's exercise of its peremptory challenges.

¶40. As the discussion, *supra*, demonstrates, the trial judge applied our *Batson* law properly to both Sewell and the State, and did not abuse his discretion. Therefore, Sewell's assertion that the trial judge arbitrarily applied our *Batson* law is not supported by the record.

¶41. Sewell further asserts that her due process rights were abridged by the refusal to allow her the opportunity to establish that juror Whitaker, who had been the subject of an unsuccessful peremptory challenge as discussed, *supra*, had not been truthful during the questioning of the venire. During voir dire, the court and later Sewell, asked if any of the potential jurors or anyone related by blood or marriage to the potential jurors had written letters to the Attorney General or other officials expressing an opinion concerning voter fraud in Wilkinson County, and Whitaker did not indicate that she did.

¶42. Sewell discovered from a review of the letters produced by the State, apparently after the trial, a letter Whitaker's husband had written to the Attorney General regarding the issue of vote fraud "in the recent Wilkinson County Sheriff's race/election and subsequent trial." On Sewell's motion for a new trial, Whitaker's husband, Eli, testified that his wife was unaware that he had written that letter. The trial judge refused to allow juror Whitaker to testify regarding her knowledge of the letter, relying on the results of the rather exhaustive examination during voir dire on that issue to form his decision as to Sewell's motion for a new trial.

¶43. In *Odom v. State*, this Court expounded the test for determining whether a new trial should be granted upon a showing that a juror wrongfully withheld information during voir dire to the prejudice of the defendant:

Therefore, we hold that where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered.

*Odom v. State*, 355 So.2d 1381, 1383 (Miss. 1978).

¶44. This Court has also made clear that no precise formula exists for answering these three questions, but rather the trial court must make an ad hoc determination based on the facts before it. *Odom v. State*, 355 So.2d at 1383.

It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong....[N]o firm, unbending rule can be laid down that would control every situation that might arise on the voir dire of prospective jurors. Therefore, each case must be decided on an ad hoc basis considering the facts then before the court.

*Id. Accord Brown v. State*, 529 So. 2d 537, 539 (Miss. 1988); *Logan v. State*, 465 So. 2d 339, 340 (Miss. 1985); *Tolbert v. State*, 511 So.2d 1368, 1377 (Miss. 1987). Understandably, such a fact intensive inquiry results in a very deferential standard of review, at least with respect to the question of whether each discrete part of *Odom* is satisfied, thus giving rise to presumptive prejudice. *See Lewis v. State*, 580 So.2d 1279, 1283 (Miss. 1991). Here, the question of whether Whitaker or her husband had written a letter was obviously relevant and unambiguous, and the critical inquiry was whether Whitaker had "substantial knowledge" that her husband wrote the letter.

¶45. Juror Whitaker was under oath when she was interrogated during voir dire. Her husband, Eli, was under oath when he testified. As the trial judge stated:

The Court clearly recalls the voir dire of each and every juror as to their knowledge of this case. The Court recalls that there were four white jurors on the potential panel; the Court allowed the attorney for the defendant to challenge three out of the four; the Court found no validity whatsoever to the challenge by counsel for the defendant, Mr. Sanders, in regard to Mrs. Whitaker. The Court recalls that Mrs. Whitaker either did not answer or did answer in the negative when I asked whether or not she or any members of her family had written letters. Now, we have before us a statement that Mr. Whitaker who took the witness stand and testified under oath, that he did in fact write a letter to the Attorney General of the State of Mississippi, but that his wife had no knowledge whatsoever of his having done so to the best of his knowledge.

¶46. As the foregoing clearly shows, the judge had ample evidence from which to conclude that Whitaker had no knowledge of the letter her husband wrote. Based upon the abuse of discretion standard of review articulated, *supra,* we find that the trial judge did not abuse his discretion by not

allowing juror Whitaker to testify in Sewell's motion for a new trial and that the judge was within his discretion to determine that the results of the extensive voir dire confirms Whitaker's lack of "substantial knowledge" that her husband had written the letter.

¶47. This assignment of error is without merit.

## II. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING AND/OR REFUSING TO FULLY INSTRUCT THE JURY ON THE LAW.

¶48. Sewell argues that the trial court's instructions to the jurors, specifically instructions S-1 through S-8, were improperly granted in that they were unsupported by credible evidence. The crux of her argument revolves around the trial judge's admission of Exhibit S-18 into evidence, which were various orders taken from the minutes of the Chancery Clerk's office that were apparently signed and presented by Sewell as attorney for the Department of Human Services. Sewell contends that the exemplars in Exhibit S-18 were indispensable to Frank Hicks in forming opinions as to the writer of the attesting witness' signatures on the ballot applications and the ballot envelopes. Sewell claims that the signatures in S-18 were not authenticated since no one saw her sign them. Therefore they were improperly admitted into evidence, thereby resulting in insufficient evidence upon which to base instructions S-1 through S-8.

¶49. Although this issue is framed by Sewell as an improper jury instruction, we will treat this assignment of error as an evidentiary question. If Exhibit S-18 was properly admitted into evidence, then the trial judge's jury instructions S-1 through S-8 were supported by an abundance of credible evidence. If Exhibit S-18 was not properly admitted into evidence, the jury instructions were still proper because there remained sufficient testimony and evidence to allow the jury to find that Sewell did indeed make the attesting signatures to the ballot applications and ballot envelopes.

¶50. As such, this Court reviews admission of evidence for an abuse of discretion. *Butler v. State*, 592 So. 2d 983, 986 (Miss. 1991); *Stromas v. State*, 618 So. 2d 116, 119 (Miss. 1993). "Unless the trial judge's discretion is so abused as to be prejudicial to the accused, this Court will not reverse his ruling." *Parker v. State*, 606 So. 2d 1132, 1136 (Miss. 1992); *Shearer v. State*, 423 So.2d 824, 826 (Miss.1982) (*citing Page v. State*, 295 So.2d 279 (Miss.1974)). The discretion of the trial judge must be exercised within the boundaries of the Mississippi Rules of Evidence. *Johnston v. State*, 567 So.2d 237, 238 (Miss. 1990). Evidentiary rulings are affirmed unless they affect a substantial right of the complaining party. *Ivy v. State*, 641 So. 2d 15, 18 (Miss. 1994); Miss.R.Evid. 103(a).

¶51. The signature "Sandra D. Sewell" appears on the attesting witness line on the ballot envelopes marked Exhibits S-1 and S-2, the heart of Counts I and II. The signature "Sandra D. Sewell" appears on the attesting witness line on the ballot applications marked exhibits S-3 through S-8, the focus of Counts III-VIII. The exhibit numbers correspond to the count numbers -- S-1 the core of Count I, S-2 the focus of Count two, etc.

¶52. Frank Hicks, the State's handwriting expert, testified as to the opinions a handwriting expert can give when examining a known exemplar and a questioned writing:

> There are two conclusive opinions that can be given. One is that the writing has been identified as having been prepared by the subject who prepared the known writing. And the other is an

elimination where the examiner says that the subject did not prepare the questioned writing. In between these two extremes are a number of opinions we refer to as inconclusive opinions. If you consider the opinions that can be given to be a straight line, on one end you've an identification; on the other end you've got an elimination. Right in the middle you've got the no opinion where there's for some reason not enough evidence to warrant the formation of any opinion at all. Proceeding from this point toward identification, there are three inconclusive opinions. The weakest is that there is some reason to believe that this subject prepared the questioned writing. The stronger opinion is that there is reason to believe that the subject prepared the questioned writing. And then just shy of an identification is the opinion that there is strong reason to believe that the subject prepared the questioned writing. Then there are similar opinions going the other direction from the middle of the line toward elimination; and those opinions are some reason to doubt, reason to doubt, strong reason to doubt, and then the elimination.

¶53. Hicks testified that the "strong reason to believe" opinion was "as close as you can get to an identification without actually being able to make an identification." Even when the expert's opinion does not serve to identify or eliminate a particular writer as the source of questioned writing, that opinion is helpful to the trier of fact because "[a]n expert opinion regarding handwriting need not be based upon absolute certainty in order to be admissible." *United States v. Herrera*, 832 F.2d 833, 837 (4th Cir. 1987).

¶54. In order for "Sandra D. Sewell" signatures to be authenticated by comparison, as allowed by Miss.R.Evid. 901(b)(3), state investigator Jim Gilliland ("Gilliland") obtained handwriting samples, or exemplars, from Sewell on June 30, 1992, pursuant to court authorization. Sewell's exemplars were entered into evidence as composite Exhibit S-16.

¶55. After examination of the requested exemplars collected by Gilliland of Sewell in Exhibit S-16, Hicks then asked for additional collected exemplars, since it might then be possible to form a more conclusive opinion. Warren Emfinger went to the Wilkinson County Chancery Clerk's office and made copies of court documents from the Chancery Court minutes bearing the signature "Sandra D. Sewell," compared the copies with the original, and produced these compared copies[6] at trial where they were admitted into evidence as Exhibit S-18.

¶56. Hicks conducted additional examinations of the "Sandra D. Sewell" signatures in Exhibits S-1 through S-8 using both the requested samples in Exhibit S-16 and the collected exemplars in Exhibit S-18. He upgraded his opinion by positively identifying the writer of the standards in Exhibits S-16 and S-18 (Sewell) as the writer of the questioned attestation signatures in Exhibits S-3 through S-8 (Sewell). Hicks's original opinion that there was a strong reason to believe that the writer of the S-16 exemplars was the writer of the questioned "Sandra D. Sewell" signatures in Exhibits S-1 and S-2 was unchanged after his additional comparison of the collected exemplars in Exhibit S-18.

¶57. Miss.R.Evid. 901 governs the authentication requirements for evidence. "The requirement for authentication is . . . satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Miss.R.Evid. 901(a). Additionally, "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated" is permitted for authentication. Miss.R.Evid. 901(b)(3). "A person's handwriting may be authenticated by a handwriting expert or by

a lay witness with a prior familiarity with that person's handwriting." ***Hentz v. State***, 542 So. 2d 914, 917 (Miss. 1989).

¶58. In the instant case, the trial judge was well within his discretion in admitting Exhibit S-18 into evidence. First, the collected writings comprising Exhibit S-18 were compared with other writings properly authenticated, i.e.,the requested samples in Exhibit S-16 obtained by Gilliland pursuant to court order. He testified that he was present when she signed her name to the cards which were admitted as Exhibit S-16. Hicks compared the two writings and concluded that they were written by the same person. This satisfies the requirement of authentication set forth by Miss.R.Evid. 901(b)(3) and ***Hentz***.

¶59. Second, the Miss.R.Evid. permits the trier of fact, in this case, the jury, to compare specimens with authenticated specimens for determination of their authenticity. *See **United States v. Fields***, 923 F.2d 358 (5th Cir. 1991), overruled on other grounds by ***United States v. Lambert***, 984 F.2d 658 (5th Cir. 1993).. Here, the writings in Exhibits S-16 and S-18 were admitted for the jury to compare with the questioned signatures. Beyond those writings, Sewell's signature appears on her "Application for Notary Public Commission," and this document was available for the jurors' comparison as Exhibit S-17.

¶60. Third, the State cites a liberal preference for admission of evidence as the approach for authentication and identification under Rule 901(a) on the federal level, after which our rule is patterned. "[T]here need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic." ***United States v. McGlory***, 968 F.2d 309, 328-29 (3rd Cir. 1992)(*quoting **Link v. Mercedes Benz of North America,*** 788 F.2d 918, 928 (3rd Cir. 1986)).

¶61. In the instant case, the documents with Sewell's signature which comprise Exhibit S-18 were taken from the minutes of the Chancery Court. Each of the documents were signed "Sandra D. Sewell" as the attorney for the Department of Human Services. An attorney signature line appears on each order and judgment, preceded by either "Presented to the Court:", or "Prepared for the Court By:", or "Approved as to Form." Kenny Middleton, a self employed attorney who also serves as Mayor of Fayette, testified that these sections are customarily used by the attorney who presents the document to the court. Jimmy Reese, a life-long resident of Wilkinson County, testified that Sewell served as attorney for the Department of Human Services during the period when these orders and judgments were signed. We find that the judge was well within his discretion in the admission into evidence of Exhibit S-18.

¶62. Based on the foregoing discussion, we find that there was indeed sufficient evidence in the record to support the granting of jury instructions S-1 through S-8. This assignment of error is without merit.

### III. WHETHER THE STATE VIOLATED THE CRIMINAL RULES OF DISCOVERY.

¶63. Sewell argues that the State violated the criminal rules of discovery because letters written to various state officials by citizens of Wilkinson County concerning the alleged voter fraud in the

county were not produced before trial. She contends that as a result she was denied an impartial and fair trial.

¶64. Rule 4.06(a)(5) and (i) of the Uniform Criminal Rules of Circuit Court Practice ("UCRCCP") states, in relevant part:

> (a) Upon written request by the defendant, the prosecution shall disclose to each defendant or to his or her attorney, and permit him or her to inspect, copy, test, and photograph, without the necessity of court order, the following which is in the possession, custody, or control of the State, or the existence of which is known, or by the exercise of due diligence may become known, to the prosecution:

> (5) Exhibit any physical evidence and photographs relevant to the case or which may be offered into evidence; and

> \*\*\*

> (i) If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule, request, or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such order as it deems just under the circumstances.

This rule has been brought forward in the Uniform Circuit and County Court Rules ("URCCC") as rule 9.04(A).

¶65. In the instant case Sewell served a Motion for Production on June 28, 1993, prior to the trial set for July 15, 1993. The motion requested

> Any and all letters, correspondence and other documents or things, oral or written, which are in the custody and control of the Attorney General or his staff and employees, the Secretary of State, his staff or employees, the Commissioner of Public Safety, his staff or employees, the Governor, his staff or employees, the Speaker of the House, his staff or employees relating to complaints or comments on the September, 1992 [sic 1991] First Democratic Primary Election and the October, 1992 [sic 1991] Second Democratic Primary Election in Wilkinson County, Mississippi.

On the first day of trial, prior to voir dire, in the midst of a number of Sewell initiated pre-trial motions, Sewell moved for a continuance based upon her contention that the State had not responded to her motion for production.

¶66. The State asserted that Sewell was told that the letters she requested were available for inspection stating "when I was here the last time, I told you I had those for you and they were available to you; and I've got them this morning, and they're available to you," and further maintained that the State did not receive the motion in a timely fashion. The State, in its brief, contended that these letters were available to Sewell in the first trial, which ended in a mistrial, and some were placed into evidence at that trial. Sewell claimed that the letters were never produced to her and that she was only provided with this information on the morning of the trial. Additionally, the State claimed that the documents requested are not covered by UCRCCP 4.06 (brought forward in

URCCC 9.04(A)), arguing that the items requested by Sewell are not discoverable for purposes of conducting voir dire. The trial judge ordered that Sewell have access to copies of those 119 letters. The trial judge then overruled Sewell's motion for a continuance and proceeded with voir dire.

¶67. Sewell argues that the lack of access to those letters deprived her of needed information for voir dire and additional ammunition in the exercise of her for cause and peremptory challenges. Sewell claims that she would have been better equipped to challenge Juror Janet Whitaker, discussed *supra* in Issue I-B. As a result of the State's late production of the letters, Sewell asserts that she did not have a "meaningful opportunity" to review the material.

¶68. Even if Sewell's account of the events transpiring, *supra*, is accepted, her argument fails. If the letters requested by Sewell are, indeed, covered by UCRCCP 4.06, and the existence of, as well as the opportunity to inspect, said letters, then Sewell failed to follow the procedure outlined in the UCRCCP by failing to bring to the attention of the court the State's failure to respond to her motion to produce the letters UCRCCP 4.06 (i), as Sewell brought this to the court's attention only on the day of the trial. The State argues that, under ***Lambert v. State***, 518 So. 2d 621, 623 (Miss. 1987), Sewell was under a duty to bring the motion to the attention of the court and obtain a ruling upon it. Otherwise, under ***Billot v. State***, 445 So. 2d 455, 456 (Miss. 1984), such would be waived. Therefore, Sewell was remiss in her duty in not bringing this matter to the court's attention until the day of the trial.

¶69. Sewell argues that under ***Jenkins v. State***, 607 So. 2d 1171 (Miss. 1992) she should have been given an opportunity to review the letters; and therefore, reversal is required due to the State's failure to produce the letters and her lack of opportunity to review the letters prior to voir dire. However, the trial judge cured any disadvantage to Sewell's voir dire interrogation by allowing her to question the jurors as to whether any of them had written, or was related to anyone who had written, letters regarding the said elections. As discussed in Issue I-B, *supra*, Juror Janet Whitaker, according to her answers in voir dire and her husband's testimony in the hearing regarding Sewell's motion for a new trial, was not aware of the letter her husband had written to the Attorney General. Absent proof of misrepresentation, the trial judge observed voir dire and Eli Whitaker's testimony and judged their responses to be credible, as is his province.

¶70. The responsibility for Sewell's failure to have timely access to the letters is laid squarely at her feet. First, the State met its obligation under UCRCCP 4.06 by disclosing and making available to Sewell the letters she requested and apparently would have done so earlier had the request been made. Second, Sewell filed her discovery motion with reference to such letters two weeks before trial. She was aware that such letters existed at the first trial held in the previous March. To delay a motion for the discovery of such letters until June is risky and borders on dangerous. Third, she did not press the discovery motion by making the trial court aware of this matter until the day of trial. Fourth, Sewell did not bring Whitaker's letter to the judge's attention until her motion for a new trial. She received the approximately 119 letters on the first day of trial. Had she brought the letter to the attention of the judge during the trial, he would have had the opportunity to replace Whitaker with an alternate juror, as he did in Sewell's earlier trial. We cannot hold a trial judge in error when he was not given the opportunity to correct such during the trial. *See* ***Foster v. State***, 687 So. 2d 1124, 1136 (Miss. 1996); ***Touart v. Johnston***, 656 So.2d 318, 321 (Miss.1995). We cannot say that a trial judge abused his discretion in not continuing the trial under the circumstances. This assignment of error is

without merit.

## IV. WHETHER THE COURT ERRED IN IMPOSING AN ILLEGAL SENTENCE UPON APPELLANT.

¶71. Sewell contends that a person convicted and sentenced pursuant to Mississippi Code Annotated section 23-15-753 shall be sentenced for either a misdemeanor or a felony, depending upon the sentence actually imposed. That section provides maximum sentences of not more than one year in the county jail and a $5,000 fine, *or* not more than five years in the penitentiary. Miss. Code. Ann. § 23-15-753 (1990). On August 2, 1993, the court sentenced Sewell on Count I to five years and a $1,000 fine and on Count II to five years and $1,000 fine with two years suspended and Count II to run consecutively with Count I, with the total sentence under Counts I and II being eight years and $2,000 in fines. The sentences for Counts III through VIII were five years on each count, to run concurrently with Counts I and II.

¶72. The core of Sewell's argument is that the statute does not allow for the imposition of a fine *and* a term of years in the penitentiary on Counts I and II and contends that such is an illegal sentence requiring reversal. Sewell's argument is well taken. The judge did not have the statutory authority to both sentence her to a term of years in the penitentiary and to fine her on Counts I and II. This Court has no way to discern which sentence the trial judge intended. Sewell then is entitled to relief, as no court may adjudge and sentence a defendant beyond its statutory authority to do so. *See **Luckett v. State**,* 582 So.2d 428, 430 (Miss.1991) (stating that a sentence beyond the statutory prescription is a fundamental violation of due process); ***Lanier v. State***, 635 So.2d 813, 816 (Miss.1994) (noting that a sentence beyond the statutory prescription is unenforceable). Therefore, we reverse Sewell's sentence and remand her cause to the lower court for re-sentencing.

## CONCLUSION

¶73. The crime of which Sandra Sewell has been convicted is serious and goes to the heart of our election process. Moreover, the voter fraud was conducted through the commission of a notary public and by a licensed attorney, an officer of the court. The actions of which Sewell is convicted shatter the public's faith and trust in our electoral system and cannot go unpunished. In response to her conviction and sentencing, Sewell has raised a host of issues which, taken as a whole, express her belief that she did not receive a fair trial. The errors she cites are without merit, save her assignment of error as to sentencing. As such, we affirm Sewell's conviction. However, because the trial judge sentenced Sewell beyond what is statutorily authorized, we reverse and remand for the sole purpose of re-sentencing of the convictions under Counts I and II within the statutory framework.

¶74. **CONVICTION OF EIGHT COUNTS OF VOTER FRAUD AFFIRMED. REVERSED AND REMANDED FOR RESENTENCING OF THE CONVICTIONS UNDER COUNTS I AND II.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., ROBERTS, SMITH AND MILLS, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, J.**

**BANKS, JUSTICE, DISSENTING:**

¶75. Because I disagree with the majority concerning the handling of *Batson* and juror Whitaker, I dissent.

¶76. Having a husband in law enforcement has been referred to as a *per se* race neutral reason for exclusion in a criminal case. *See **Lockett v. State,*** 517 So.2d 1346, 1352 (Miss. 1987). As far as I can tell, that fact is unrebutted and I have not seen in the record where it was argued that others similarly situated were not stricken. The trial court jumped on the "by the way" assertion that she was employed by a segregated institution and, relying on a newspaper ad, suggested that this was not so. He never addressed the other reasons proffered, including law enforcement relative and eye contact.

¶77. The State asserts that association with a "segregated" institution is a race-based criteria. I disagree. The analogy to Alcorn is not an apt one. Alcorn is a state institution open to all by court decree. While there was no extended discussion of the matter, I think that it is clear -- as a matter of our history -- that private elementary and secondary academies were formed in the 1960's and 1970's to avoid the effect of public school desegregation. In recent years, some have admitted blacks and more have expressed an open door policy. The expressed open door policy, however, is or may be in response to the fact that the failure to do so deprives the institution of tax-exempt status. Such institution may remain, as a matter of fact, segregated by affirmative choice. We do not have enough facts to determine whether the academy in question was ever or is now a "segregated" institution. Our history suggests that it may in fact be, and to my mind's eye, the judge's notice of a newspaper ad was not sufficient to conclusively establish that it is not or make any other finding of fact of consequence to the bona fides of the proffered reason.

¶78. Moreover, and more importantly, that issue is not central to the defendant's challenge. Contrary to the state's suggestion in its brief that the segregated academy issue was the primary thrust of the defendant's proffered reasons for removal, the record reflects that this issue came under the category of "I might note" after the primary suggestion that Whitaker should be stricken because her husband was in law enforcement.

¶79. It is at least ironic that there should be another dispute involving this same juror and whether she knew or did not know that her husband had written a letter to the attorney general urging prosecution in these cases. I cannot understand how the court can be excused for not allowing her to be asked that specific question. Whatever her responses during voir dire to the general questions, given the fact that there is conclusive proof that her husband did write such a letter we cannot justify the court's reliance on one person's testimony as to what someone else knew "to the best of his knowledge." I see no room for discretion here.

¶80. Mrs. Whitaker should have been asked whether she knew of the letter and, if so, her explanation for having failed to disclose that information during voir dire. Because the majority concludes otherwise, I respectfully dissent.

**McRAE, J., JOINS THIS OPINION.**

1. *McFarland v. State, No. 94-KA-00191-SCT,* 1997 WL 719171 (Miss. Nov. 20, 1997), reh'g denied, February 26, 1998.

2. Sewell's signed application for a notary public commission, dated July 1, 1988, was approved on July 11, 1988. Mississippi Code Annotated section 25-33-3 (1991) directs that each notary public have a seal with her name in the margin thereof, and that this seal be used to attest to the "official acts" of the notary. According to Gwen Bell, who examined the ballot applications in evidence, an embossed seal with the name "Sandra Sewell" appeared on each of these applications.

3. The Sewell-notarized ballot applications and ballots formed the basis for a March 19, 1992, indictment returned against Sewell, alleging voter fraud. Sewell filed a motion to quash the indictment, alleging that African Americans had been systematically excluded from serving as grand jury foreperson, in that 76 of the last 77 grand jury forepersons had been white. An Agreed Order Allowing *Nolle Prosequi* was entered in September, 1992.

4. The opinions of Frank Hicks are discussed in greater depth in Issue II, *infra*.

5. State Exhibits S-1 through S-8 are numbered so as to correlate with the corresponding count number.

6. Compared copies of public document are admissible pursuant to Miss.R.Evid. 1005.