# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00873-SCT

*CORTEZ WATTS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/26/2021 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| TRIAL COURT ATTORNEYS: | STEPHANIE ALEXIS BROWN |
| | ROSHARWIN LEMOYNE WILLIAMS |
| | RICHARD B. LEWIS |
| | RICHARD BROOKS LEWIS, JR. |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ZAKIA HELEN ANNYCE BUTLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/22/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Cortez Watts argues that the failure of two jurors to properly respond to questions asked during voir dire deprived him of the right to intelligently participate in the jury selection process. Therefore, Watts contends that the trial court erred by denying his motion for judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. Because

the trial court did not clearly err by finding that the jurors lacked substantial knowledge of the information sought to be elicited during voir dire, we affirm the decision of the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2.     A Tunica County grand jury returned a multi-count indictment against Watts for conspiracy to commit armed robbery, attempted armed robbery, armed robbery, aggravated assault, and felon in possession of a firearm. Watts's second trial commenced on April 16, 2021.[1] On the night of October 16, 2016, and into the morning of October 17, 2016, Watts and his girlfriend, Tanyatta Kinnel, were at the Horseshoe Casino in Tunica County.[2] Derek Phillips and Barry McCray also were at the Horseshoe that night and into the next morning.

¶3.     Phillips stated that he was winning money while playing the game Craps. He testified that a man and woman were behind him at the Blackjack table that night and that the man had periodically asked him for cigarettes. At some point, the woman walked up to Phillips and handed him a napkin with her name and phone number on it.[3] Phillips stated that the name on the napkin was "Kanyatta, Tanyatta, something like that." He testified that he had known

---

[1]At the conclusion of Watts's first trial, Watts was convicted on all counts, excluding armed robbery. In January 2019, the Mississippi Court of Appeals reversed Watts's convictions and remanded the case for a new trial after finding that the trial court had erred by failing to conduct a proper *Batson* analysis before denying Watts's use of a peremptory strike on a juror. *Watts v. State*, 281 So. 3d 873, 876 (Miss. Ct. App. 2019). *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2]Watts's cousin was with the couple at first, but had left earlier in the night.

[3]The record contains a picture from a surveillance camera at the Horseshoe that appeared to capture this exchange.

her previously but that he had not seen her in a while. Phillips had not seen the man before that night. He testified that Kinnel had told him at some point that the man "wasn't her guy." Phillips stated that he later learned that Watts was the man who had periodically asked for cigarettes that night.

¶4. Phillips and McCray left the casino at approximately 2:30 a.m. Phillips stated that he text messaged Kinnel shortly after he left. Kinnel responded and asked him to bring her a Sprite. Phillips and McCray then proceeded to Kirby Estates Apartments to meet Kinnel.[4] When Phillips and McCray arrived at Kirby Estates, Kinnel approached the vehicle and when Phillips attempted to hand her the Sprite, she asked Phillips to get out of the vehicle and to give her a hug. Phillips stated that he observed a man in front of his vehicle and later identified him as Javonta. After Phillips got out of the car, Phillips testified that Kinnel began to run. Phillips stated that Watts then approached him from behind, told Phillips to give him the money he had just won at the casino, and attempted to pull a gun from his waistband. Phillips testified that he began running and that Watts ran after him and shot him. Phillips sustained a gunshot wound to the neck. Phillips later identified Watts and Kinnel in a photo lineup.

¶5. McCray corroborated Phillips's testimony and testified that after Phillips had gotten out of the car, McCray heard "some commotion" and got out of the passenger side. When he looked at the back of the car, McCray testified, he observed Phillips with his hands in the air,

---

[4]Watts lived at Kirby Estates with his father and one of his brothers, Javonta Watts.

a man in front of him pointing a gun, and a young woman who started to run. McCray stated that he began to run at that point. After hearing a gunshot, McCray called the police. McCray misidentified both Watts and Kinnel in a photo lineup.

¶6. Fredrick Jackson, Watts's half-brother, testified that Watts and Kinnel had been in Watts's room at Kirby Estates that night around 2:00 a.m. and that Javonta had been on the couch. Jackson testified that Kinnel left at some point that night but that Watts had stayed in the room.[5] Jackson stated that he left the apartment at approximately 3:00 a.m. and observed police cars in the parking lot. When Jackson returned to the apartment around 4:00 a.m., he testified that he saw Watts in his room but did not see Kinnel or Javonta. Watts testified that when he returned home from the casino, he went to his room and fell asleep.

¶7. The jury found Watts guilty of conspiracy to commit armed robbery, attempted armed robbery, aggravated assault, and possession of a firearm by a convicted felon.[6] Watts was sentenced to serve five years for conspiracy to commit armed robbery, fifteen years for attempted armed robbery, ten years for aggravated assault, and five years for possession of a firearm.

¶8. After Watts's convictions, he filed a motion for JNOV or for a new trial and argued, inter alia, that he had learned after trial that two jurors, Vivian Smith and Nastassia Joyner, had withheld important information during the jury selection process. Watts claimed that

---

[5] In Jackson's prior testimony, he had stated that he had not seen Kinnel leave the apartment that night.

[6] The armed robbery charge had been disposed of.

4

Smith, Juror 29, and Joyner, Juror 30, each had failed to disclose that they were related to Kerris Black, an individual who was murdered in 2006 by Watts's brother James Watts.[7] Watts requested an evidentiary hearing to question the jurors and to further develop essential facts. The State agreed that an evidentiary hearing should be held.

¶9.     The trial court conducted an evidentiary hearing on July 21-22, 2021. During the evidentiary hearing, the parties agreed that in approximately January 2006, James Watts, Watts's brother, had pleaded guilty to manslaughter for the death of Black. It was established that during voir dire, the trial court had asked the jury panel the following questions:

1.     Anybody simply know the defendant, Mr. Watts? You just know him or know of him or members of his family?

2.     How many of you—you or a loved one have been the victim of a crime of violence?

3.     Is there anything about your knowledge of or your acquaintance with either the parties, the witnesses, or the attorneys, whether it's a matter of like or dislike, whether it arises from friendship, personal association, business association, fraternal affiliation, church membership, or otherwise that would in any manner affect you in the trial of this case? If you've not told me yet, tell me now.

Neither Smith nor Joyner responded.

---

[7]Watts's trial counsel executed an affidavit stating that in 2006, James Watts was charged and convicted in the Circuit Court of Tunica County for the murder of Black. Jamorris Watts, Watts's brother, also submitted an affidavit stating that he knew Smith and Joyner and knew that they were both relatives of Black's.

¶10.    Watts first testified at the evidentiary hearing that he had attended grade school with Joyner but that he had not recognized her at trial.[8] Watts had seen Smith at the liquor store where she worked a couple of times but had never talked to her or had a personal relationship with her.

¶11.    Smith testified that she had known Black and that he had been her first cousin's son.[9] The trial judge asked how well she had known Black, and she responded, "I just know—I know he was in the family with me, but I didn't deal with him." Smith testified that she did not know what happened to Black, but that she knew he had died. She stated that she could not remember if she had been told that he had been killed. Smith did not know any details about how Black was killed, if it had involved another person, or who might have killed him. Smith again stated that she did not have a relationship with Black and said, "[h]e was just in the family" and that she cared about her whole family but she "didn't have any dealing with him." Smith also testified that she did not know Watts or James but stated that Jamorris Watts[10] was Watts's half-brother and was her best friend's son.

¶12.    Smith stated that she had not responded to the question regarding whether she or a loved one had been a victim of a crime of violence because she had not known about Black.

---

[8]Watts testified that he had dropped out of school in the eighth grade. At the time of the evidentiary hearing, Watts testified that he was thirty-three years old.

[9]Smith initially was unsure whether Black had been her cousin's son or grandson. She confirmed that Nell Black was Kerris Black's mother and that Nell's mother was named Dora Williams. Cora Granberry was Smith's mother and Dora's sister.

[10]Jamorris is also referred to as "Pookie Vaughn" in the record.

She stated that Black was "a loved one because he was my family, but I didn't know it had anything to do with this case" and did not know "what had killed him or anything." Smith had not attended Black's funeral. Additionally, Smith testified that Sharon Granberry Reynolds, the Tunica County circuit clerk, was her sister and that Smith considered her a loved one.

¶13. Joyner testified that she was related to Smith and that Smith was her great aunt. Reynolds also was her great aunt. Joyner stated that she knew that Black was related to her but that it was "down the line." She stated that she did not have any recollection of Black and "didn't have any close relationship with him besides seeing him outside and saying hi as we were bypassing each other." Joyner testified that she had never socialized with Black and did not know what had happened to him other than remembering that he had died. She stated that someone might have told her that Black had died "from a shooting or something." She did not know any details surrounding the shooting and did not know who had supposedly shot him. Joyner testified that Black had been a loved one because he was family but she had not attended any family functions that he had also attended and that she had not been close to Black and had no relationship with Black. She had not attended Black's funeral.

¶14. Joyner additionally stated that she had not known Watts prior to trial and had not known any of Watts's family members. She stated that she did not recall grade school because she had suffered a stroke in November 2020, prior to Watts's trial, and did not remember many things before that.

¶15.    Reynolds testified that she had been the circuit clerk when Black was killed and when James was indicted. Reynolds had known about James being charged with Black's murder and that Smith and Joyner were related to Black. Reynolds also had known at the start of the trial that James was Watts's brother.  Reynolds stated, however, that she did not think she had to notify the court of that information.

¶16.    Lastly, Jamorris testified that his best friend was Joyner's half-brother, Jamal Dorsey Gill. Jamorris stated that he had not had much contact or relationship with Joyner herself. But Jamorris testified that he had discussed Black's murder on occasion with Gill and with Joyner's half-sister Nadia. Regarding Black's death, Jamorris stated that he knew that "at least two of [Joyner's] siblings had talked about it. Her sister explained that their family was grieving." Additionally, he stated that Nadia had expressed to him that James "had killed her cousin and that it hurt their family." Jamorris did not have any personal knowledge of how Black's death had affected Joyner and testified that he had not discussed Black's death in front of Joyner.  Jamorris testified, however, that he believed that Joyner had personal knowledge of Black's death and knew who had killed him. Jamorris admitted that he had never seen Joyner and Black together and did not know if they had any type of relationship. But he stated that he "kn[ew] from social media that she still is in contact or socialization with members of Kerris' family." When asked how Jamorris knew that Joyner had personal knowledge of the facts surrounding Black's death, he stated, "[b]ecause her brother stated that 'their' family and I'm assuming [Joyner] is included in 'their' family."

¶17.    Jamorris also testified that Joyner, Watts, and he had "all visited, frequented each other around the age of—between the ages of ten and 13." He did not know if Joyner had any contact with Watts after those ages.

¶18.    At the conclusion of the hearing, the trial court found no merit in Watts's assignments of error and denied his motion for JNOV. The sole issue on appeal is whether Smith's and Joyner's voir dire omissions had a prejudicial effect on jury selection.

## ANALYSIS

¶19.    A "clearly erroneous" standard of review is used when reviewing a trial court's finding that a jury was fair and impartial. *Magee v. State*, 124 So. 3d 64, 67 (Miss. 2013) (internal quotation marks omitted). "It is . . . a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978)).

¶20.    Mississippi Code Section 13-5-69 provides that "the parties or their attorneys in all jury trials shall have the right to question jurors who are being impaneled with reference to challenges for cause, and for peremptory challenges . . . ." Miss. Code Ann. § 13-5-69 (Rev. 2019). This Court previously has stated that "[t]he failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause." *Odom*, 355 So. 2d at

9

1383. Therefore, in the event that a prospective juror fails to respond to an unambiguous question despite having relevant knowledge pertaining to the question at issue, this Court developed the following test:

> [T]he trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong.

*Id.* (footnote omitted) (citing *Jones v. State*, 133 Miss. 684, 98 So. 150 (1923)).

¶21. The trial court found that, under the *Odom* test, the questions propounded to the jurors were relevant to the voir dire examination and were unambiguous. *Odom*, 355 So. 2d at 1383. However, the trial court found that

> [t]hrough [Smith's] responses, her tone of voice, her demeanor, it was apparent to the court that she viewed Black as a distant or remote relative and that although she stated that he would be a 'loved one' as that phrase would be used toward anyone 'in the family,' there was a complete absence of any emotional attachment to Black such that would have necessitated a response to the subject question.

Therefore, the trial court found that Smith had lacked substantial knowledge of the information sought to be elicited in voir dire and found no merit in Watts's assignment of error regarding Smith. The trial court additionally found that Joyner lacked substantial knowledge of the information sought to be elicited in voir dire and found no merit in Watts's

10

assignment of error regarding Joyner. Accordingly, the trial court denied Watts's motion for JNOV.

¶22. The trial court did not clearly err by denying Watts's motion. The trial judge's conclusions that both Smith and Joyner had lacked substantial knowledge of the information sought to be elicited were fact-finding determinations. As this Court has stated, "no precise formula exists for answering these three questions, but rather the trial court must make an ad hoc determination based on the facts before it." *Sewell v. State*, 721 So. 2d 129, 137 (Miss. 1998) (citing *Odom*, 355 So. 2d at 1383). "Understandably, such a fact intensive inquiry results in a very deferential standard of review, at least with respect to the question of whether each discrete part of *Odom* is satisfied, thus giving rise to presumptive prejudice." *Id.* (citing *Lewis v. State*, 580 So. 2d 1279, 1283 (Miss. 1991)).

¶23. Both Smith and Joyner testified that they had not been close to Black and that they lacked knowledge of the circumstances surrounding Black's death. The trial court gave detailed findings about its observations during the evidentiary hearing. The trial court noted that Smith's voice and demeanor indicated a lack of emotional attachment to Black. The trial court additionally stated that it was "obvious that [Joyner] considered Black a distant and/or remote relative" and pointed out that she also stated that she had no emotional attachment to Black. Considering the jurors' testimony and the trial court's observations, the trial court did not clearly err by finding, under the *Odom* test, that the jurors lacked substantial knowledge of the information to be elicited, namely the circumstances of Black's death.

11

¶24. Watts further argues that Reynolds's failure to alert the trial court or the parties of her family's ties to Black and Watts caused an appearance of unfairness. He refers to this Court's prior finding that "[o]f equal or greater importance in this regard is the appearance of unfairness, and this is of vital importance; for public confidence in the fairness of jury trials is essential to the existence of our legal system." *Perkins v. State*, 244 So. 2d 414, 415 (Miss. 1971). In *Perkins*, this Court reversed the defendant's conviction because a material witness in the case, who was also a courtroom deputy, had conversed with a juror shortly after his testimony for the State. *Id.*

¶25. In the case at hand, Reynolds's knowledge of the connection between James, Watts, Smith, and Joyner does not create such an appearance of unfairness that it would undermine public confidence in the fairness of jury trials. *Perkins*, 244 So. 2d at 415. Reynolds did not testify that she had conveyed her knowledge to either juror. Watts contends that it is "plausible" that Reynolds was "amongst those they 'heard' talking about Black's death." However, no evidence supports Watts's contention. Further, the circuit clerk's primary duties are administrative. *See* Tunica County Circuit Clerk,

https://tunicacountycircuitclerk.com/?page_id=35 (last visited July 29, 2022) ("The Circuit Clerk is the administrative arm of the Circuit Court."). Watts fails to identify any duty the circuit clerk had in this particular situation to notify the court or the parties of the potential relationship between the jurors and her or between the jurors and Black.

¶26.    Watts points out that other jurors were disqualified because of their connection to Watts and/or his family. Juror 18, Tijuana Jones, was disqualified because she was Watts's first cousin. The trial court noted that a first cousin was "pretty close." Juror 49, Bobbie Miller, stated that her two oldest children were first cousins to Watts. The State used a peremptory strike to exclude Miller.  Smith and Joyner, however, had no direct connection to Watts or to Watts's family. Even a prosecutor's cousin may serve on a jury when the two "[a]t best . . . had a distant relationship . . . ." ***Doss v. State***, 709 So. 2d 369, 386 (Miss. 1996). Therefore, Watts fails to establish clear error.

## CONCLUSION

¶27.    The trial court did not clearly err by determining that the jurors in this case lacked substantial knowledge of the circumstances involving Black's death or its connection to Watts. Nor does Reynolds's knowledge establish an appearance of unfairness under these circumstances. Therefore, this Court affirms the trial court's decision to deny Watts's motion for JNOV.

¶28.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**

13